**In re MORRISTOWN LINCOLN–MERCURY, INC., Debtor.**

**HAMILTON BANK OF MORRISTOWN, Plaintiff,**

**v.**

**BANK OF COMMERCE, MORRISTOWN LINCOLN–MERCURY, INC., Richard Stair, Jr., Trustee, Billy W. Smith, and Ernie Coscia, Defendants.**

Bankruptcy No. 3–81–01889.
Adv. No. 3–82–0417.

United States Bankruptcy Court,
E.D. Tennessee.

Nov. 22, 1982.

---

See also, Bkrtcy., 25 B.R. 375; 25 B.R. 391.

380

Capps, Foutch & Cantwell, Frank P. Cantwell, Jr., Morristown, Tenn., for plaintiff.

Taylor, Tilson, Inman & Reams, H. Scott Reams, Morristown, Tenn., for defendant Bank of Commerce.

Richard Stair, Jr., Knoxville, Tenn., trustee.

Forester, Forester, Buttermore & Turner, Susan C. Lawson, Harlan, Ky., for defendant Ernie Coscia.

Rex W. Hyder, Jr., pro se.

Billy W. Smith, pro se.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

This adversary proceeding involves two [1] motor vehicles, the rights of the putative owners of those vehicles, the respective rights of two competing banks—both claim a security interest in each vehicle—and a counterclaim for alleged violations of the Truth in Lending Act, 15 U.S.C.A. § 1601 *et seq.* (1982), and Regulation Z, 12 C.F.R. § 226 (1981). Each vehicle was allegedly purchased from Morristown Lincoln-Mercury, Inc. (MLM), whose voluntary chapter 11 bankruptcy petition was filed on December 17, 1981. Later, the case was converted to chapter 7 (Liquidation). 11 U.S.C.A. § 1112(a).

---

1. The complaint filed by Hamilton Bank mentioned four vehicles. A Judgment of this court entered on July 28, 1982, required the Bank of Commerce to relinquish the certificates of title to and release its liens against the two vehicles purchased by Rex W. Hyder, Jr., and Kazuko Woody, since both were entitled to the protective status of a buyer in ordinary course.

## I

The complaint of the plaintiff Hamilton Bank of Morristown was filed on May 13, 1982. It is alleged that a 1977 Toyota recreational vehicle, acquired by MLM in a trade with an acquaintance of Ernie Coscia, was sold to Coscia by MLM. Hamilton Bank, the assignee of the chattel paper representing the contract between Coscia and MLM, contends that Coscia is estopped to deny the validity of his contract with MLM and that MLM had no rights in the Toyota when it executed a trust receipt to Bank of Commerce on a date subsequent to Hamilton Bank's accpetance of the Coscia chattel paper. Tenn.Code Ann. § 47–9–204(1) (1979).[2] Coscia and Bank of Commerce deny the validity of the contract between Coscia and MLM for the sale of the 1977 Toyota. Also, Coscia has filed a counterclaim against Hamilton Bank wherein he alleges that Hamilton Bank violated the Truth in Lending Act (TILA) and Regulation Z.

The second controverted vehicle is a 1981 Ford Van purchased by Billy W. Smith. Hamilton Bank is also the assignee of chattel paper representing the installment contract between Smith and MLM. Hamilton Bank contends that Smith is a buyer in the ordinary course of business who took free and clear of the interest of Bank of Commerce in the van. Tenn.Code Ann. § 47–9–307 (1979).[3] Bank of Commerce, on the other hand, contends that its interest against the van was perfected by virtue of the notation of its lien on the certificate of title to the van prior to the sale of the van by MLM to Smith and denies that Smith bought the van in the ordinary course of business.

The trustee in bankruptcy has not asserted any interest in either of the vehicles for the benefit of the debtor's estate.

2. "A security interest cannot attach until there is agreement ... that it attach and value is given and the debtor has rights in the collateral."

3. "A buyer in ordinary course of business ... other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller

## II

### COSCIA

Ernie Coscia and Dr. M.F. Saydjari were acquaintances residing in Cumberland, Kentucky, when Dr. Saydjari told Coscia that he wanted to trade a 1977 Toyota recreational vehicle (Serial No. RN280 942 43) and another vehicle for two different vehicles. Coscia contacted Ron Johnson, a/k/a Ronald A. Johnson, Vice-President of Morristown Lincoln-Mercury, Inc. (MLM), to inform him of Dr. Saydjari's interest in trading vehicles.[4] After an agreement to trade was reached between MLM and Dr. Saydjari, two vehicles were delivered to him in Cumberland, Kentucky.

A 1977 Toyota recreational vehicle which Dr. Saydjari had agreed to trade to MLM was in Coscia's possession at the time of delivery of the two vehicles to Dr. Saydjari. The doctor had permitted Coscia to borrow the vehicle on occasion. Coscia had enjoyed using it and expressed his interest in purchasing it to Ron Johnson, who left the vehicle in Coscia's custody.

About a week later, Coscia executed a "Retail Installment Contract and Disclosure Statement (Security Agreement)" (Tr.Ex. 1). Coscia ostensibly agreed to buy the 1977 Toyota from MLM under the terms of this contract, executed on or about October 12, 1981. However, Coscia insists that the contract does not represent his entire agreement with MLM. Coscia testified that he executed the contract with the understanding that it would neither be accepted by MLM nor binding upon him unless he subsequently ratified the agreement. Ron Johnson apparently persuaded Coscia to sign the contract despite the fact that he had not decided to purchase the vehicle.

even though the security interest is perfected and even though the buyer knows of its existence."

4. Coscia had previously purchased a vehicle from MLM. He had known Ron Johnson for approximately six months when he contacted him on behalf of Dr. Saydjari.

Within one week after executing the contract for the purchase of the 1977 Toyota, Coscia contacted Ron Johnson and informed him that he had decided not to purchase the vehicle. Thereupon Ron Johnson and another individual went to Cumberland and took possession of the vehicle. Including the period of possession prior to his execution of the contract, Coscia had possession of the Toyota for a total of approximately two weeks.

On October 12, 1981, despite Ron Johnson's agreement to hold the installment contract, MLM executed and assigned the chattel paper for the sale of the 1977 Toyota to Hamilton Bank of Morristown, in consideration of $5,500.00. Coscia received a payment book from Hamilton Bank after he had surrendered possession of the vehicle to MLM. He telephoned Ron Johnson to inform him that he had received a payment book but that there was no contract to purchase the 1977 Toyota as far as he was concerned. Ron Johnson advised Coscia that if a bank official contacted him he should simply tell him that he (Coscia) had bought the vehicle but that Ron Johnson was going to "take care of it." Coscia did not contact Hamilton Bank after the receipt of the payment book to explain his position that there was no contract.

Louis Jarvis, an installment loan officer for Hamilton Bank, noticed the 1977 Toyota on the MLM lot within one month of the acceptance of the Coscia contract by Hamilton Bank. Jarvis telephoned Coscia to verify that Coscia had purchased the vehicle described in the contract. Coscia advised Jarvis that he had purchased the vehicle but that it had been returned to MLM for repairs. Jarvis telephoned Coscia a second time, on an unknown date, after noticing that the vehicle was still on the MLM lot. Coscia reaffirmed his previous statement that he had purchased the vehicle. However, for the first time, he advised Jarvis that MLM was attempting to sell the vehicle on his behalf. Jarvis contacted Ron Johnson to confirm Coscia's statement. Coscia has admitted that he did not inform Jarvis until approximately three months after his execution of the October 12, 1981, contract (and the subsequent assignment of the chattel paper to the Hamilton Bank) of his position that there was no enforceable contract for the sale of the vehicle.

On October 29, 1981, only seventeen days after the assignment of the Coscia chattel paper to Hamilton Bank, Robert E. Johnson, President of MLM and the brother of Ron Johnson, executed a trust receipt and a note in favor of the Bank of Commerce of Morristown. Under the provisions of the trust receipt, MLM acknowledged its possession of the 1977 Toyota and the fact that a security interest either remained in or would pass to Bank of Commerce. MLM agreed to sell the 1977 Toyota for not less than $2,875.00, the amount borrowed from the Bank of Commerce and secured by the vehicle. A financing statement was not filed contemporaneously with the execution of the trust receipt. However, Bank of Commerce had previously filed floor plan financing statements on February 4, 1978, and July 3, 1979, respectively covering $70,000.00 and $75,000.00 worth of automobile inventory with the office of the Tennessee Secretary of State.

Robert E. Johnson testified that he had seen the 1977 Toyota on the lot of MLM during November and December of 1981. He did not inquire whether Coscia had rejected the October 12, 1981, contract because he thought the vehicle was in the custody of MLM for repairs.

Coscia, who has previously purchased and financed motor vehicles, insists that he signed the contract with the stipulation that it would not be accepted by MLM unless he subsequently ratified the agreement. Ron Johnson admits that there may have been an agreement of that general nature with Coscia.

Contrary to the recitation in the contract, there was no $2,500.00 down payment. In fact, Coscia has never made any payment for the vehicle. He had not had custody of the vehicle since it was picked up in mid-October by Ron Johnson.

Bank of Commerce has custody of a Kentucky certificate of title and registration

for the 1977 Toyota. This document reflects that the vehicle is owned by MLM by virtue of an assignment from M.F. Saydjari on *December 1, 1981*. Saydjari's assignment occurred seven weeks after Hamilton Bank accepted the Coscia chattel paper and four weeks after MLM executed its trust receipt on the vehicle to the Bank of Commerce. Neither Coscia nor Hamilton Bank received the certificate of title and registration. The Kentucky certificate of title and registration is the only outstanding certificate on the 1977 Toyota.

Hamilton Bank repossessed the 1977 Toyota in January or February of 1982. The vehicle was in the possession of Harold Graves, a former employee of MLM, when it was repossessed. The vehicle is presently stored in Morristown.

■ The first issue to be determined is whether there is an enforceable contract between Coscia and MLM for the sale of the 1977 Toyota. Coscia contends that he does not have a contract with MLM for the purchase of the Toyota because there was no meeting of the minds. Bank of Commerce contends that there was no sale within the meaning of that term as defined in Tenn.Code Ann. § 47–2–106 (1979).[5] Hamilton Bank concedes that its claim to the 1977 Toyota is inferior to that of the Bank of Commerce if the contract between Coscia

and MLM is invalid.[6] The issue is governed by Kentucky law since Coscia, a Kentucky resident, executed the contract and accepted delivery of the vehicle in Kentucky. *See Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833 (Tenn.Ct.App.1977), *cert. denied.*[7] It is the opinion of this court that the contract is unenforceable and that Coscia is not obligated to Hamilton Bank, the assignee of the chattel paper.

Ky.Rev.Stat.Ann. § 355.2–326(1) (1972) provides in part: "Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is (a) a 'sale on approval' if the goods are delivered primarily for use . . . ." The transaction between Coscia and MLM, at most, was a sale on approval.[8]

■ In reliance upon a contemporaneous oral agreement with Ron Johnson, Coscia was induced to execute the "Retail Installment Contract and Disclosure Statement (Security Agreement)." Coscia executed this document with the expectation that his subsequent ratification would be a condition precedent to the formation of a contract. MLM is estopped to assert the enforceability of the contract because Ron Johnson promised Coscia that MLM would hold the contract until Coscia decided whether to purchase the 1977 Toyota.[9]

---

5. This section provides in part that a "sale" consists in the passing of title from the seller to the buyer for a price.

6. Citing Tenn.Code Ann. § 47–2–201(3)(b) (1979), Hamilton Bank contends that Coscia admitted purchasing the 1977 Toyota in his answer and that this admission is a basis for finding that an enforceable agreement exists between Coscia and MLM. Ky.Rev.Stat.Ann. § 355.2–201(3) (1972), the counterpart to Tenn. Code Ann. § 47–2–201(3)(b) (1979), enacts: "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . (b) if the party against whom enforcement is sought admits in his pleading . . . that a contract for sale was made . . . ."

The court believes that this statute is inapplicable under its own terms. The disputed contract between Coscia and MLM satisfies the requirements of subsection (1) of Ky.Rev.Stat. Ann. § 355.2–201 (1972). There is a "writing sufficient to indicate that a contract for sale

has been made . . . signed by the party against whom enforcement is sought . . . ."

Furthermore, Coscia denied the alleged purchase of the vehicle in his answer. His assertion that he was a buyer in ordinary course is an alternative position alleged as an affirmative defense.

7. The contract includes a provision that requires interpretation according to the law of Tennessee. However, the question of formation in the first instance should be determined by the law of Kentucky.

8. If title to the 1977 Toyota was ever transferred from MLM to Coscia, title revested in MLM when Coscia refused to retain the vehicle. Ky. Rev.Stat.Ann. § 355.2–401(4) (1972).

9. The parol evidence rule does not preclude the testimony of Coscia concerning the contemporaneous oral agreement with Ron Johnson since the testimony concerns a representation

■ Tenn.Code Ann. § 47–9–318(1) (1979) recites:

> Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in § 47–9–206 the rights of an assignee are subject to:
>
> (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
>
> (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

Coscia is an account debtor.[10] There is no *enforceable* agreement prohibiting him from asserting defenses arising out of the sale against any assignee of MLM.[11] Additionally, the following notice is printed in boldface type at the bottom of the front page of the contract:

> "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF, RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER."

Hamilton Bank is subject to the estoppel defense of Coscia. This defense arose prior to receipt of notice of the assignment by Coscia and is available as against an assignee by virtue of statutory law and the explicit terms of the chattel paper in this instance.

■ Bank of Commerce asserts a security interest in the 1977 Toyota under a trust receipt dated October 29, 1981. It is the position of the Bank of Commerce that its security interest is perfected by previously recorded financing statements covering the debtor's automobile inventory. As a general rule, a security interest in an automobile must be noted on the certificate of title in order to be perfected in Tennessee.[12] *In re Wallace,* 251 F.Supp. 581 (E.D. Tenn.1966); *In re Crosson,* 226 F.Supp.

---

made as an inducement to the contract and it does not contradict the terms of the written agreement. *Hull-Dobbs, Inc. v. Mallicoat,* 415 S.W.2d 344 (Tenn.Ct.App.1966).

**10.** An "account debtor" is a person who is obligated on an account, chattel paper, contract right or general intangible. Tenn.Code Ann. § 47–9–105(a) (1979).

**11.** The installment contract form executed by Coscia contains the following provision: "G— WAIVER OF DEFENSES: Buyer hereby acknowledges notice that this contract may be assigned and that assignees will rely upon the agreements contained in this paragraph, and agrees that the liability of Buyer to any assignee shall be immediate and absolute and not affected by any default whatsoever of Seller signing this contract; and, in order to induce assignees to purchase this contract, Buyer further agrees not to set up any claim against such Seller as a defense, counterclaim or offset to any action by any assignee for the unpaid balance hereunder or for possession of the vehicle." This provision is not enforceable because Coscia's execution of the contract was induced by the misrepresentation of Ron Johnson to Coscia that MLM would hold the chattel paper.

**12.** Tenn.Code Ann. § 55–3–125 (1980)—*Liens and encumbrances—Filing.*—No conditional sales contract, chattel mortgage, or other lien or encumbrance or title retention instrument upon a registered vehicle, other than a lien dependent upon possession entered into after March 1, 1951, or a lien of the state for taxes established pursuant to chapter 60 of title 67, shall be valid against the creditors of an owner or subsequent purchasers or encumbrancers until the requirements of this section and § 55–3–126 have been complied with, unless such creditor, purchaser, or encumbrancer has actual notice of the prior lien.

Tenn.Code Ann. § 55–3–126 (1980)—*Constructive notice of lien upon filing request for notation—Method of giving notice.*—

. . . . .

(b) Notwithstanding any provisions of the law to the contrary, the method provided in this section and § 55–3–125 of certifying a lien or incumbrance upon a motor vehicle, mobile home, house trailer or other mobile structure, whether or not taxes as real property, subject to the provisions of chapters 1–6 of this title relative to the issuance of certificates of title shall be exclusive except as to liens depending upon possession and the lien of the state for taxes . . . .

944 (E.D.Tenn.1963). The rule is otherwise if the automobile is inventory property of the secured debtor. *In re Vaughn,* 283 F.Supp. 730 (M.D.Tenn.1968). A creditor who finances the floor plan of an automobile dealer must file a financing statement to perfect his interest.

Although there is no explanation in the record for the delay in the execution by Dr. Saydjari of his assignment to MLM of the certificate of title and registration for the 1977 Toyota, that vehicle was inventory property of MLM from the mid-October 1981 date when it was placed on the lot of MLM and offered for sale.

 Bank of Commerce has a perfected security interest in the 1977 Toyota and is entitled to possession of the vehicle and the proceeds from the sale thereof to the extent of $2,875.00, plus interest since October 29, 1981, less any payment received against the indebtedness secured by the vehicle and undisclosed by the record herein. MLM is estopped from asserting any rights to any surplus from the sale of the 1977 Toyota. Hamilton Bank is entitled to any surplus and is also entitled to judgment against MLM for any amount unpaid on the Coscia installment contract.

 Hamilton Bank was in a better position than the Bank of Commerce to have avoided any loss in this case. Hamilton Bank should have been particularly cautious since the transaction involved a used vehicle registered in another jurisdiction.[13] It appears that Hamilton Bank merely relied upon MLM and Coscia to ensure that the Bank's interest was perfected. Yet, Hamilton Bank could have avoided any loss if it had merely required MLM to surrender the certificate of title and registration at the

time of the assignment or made some arrangement with Coscia to assure that its lien would be noted on the new certificate. Then, MLM would not have been able to present the title certificate to another lender and borrow additional funds using the 1977 Toyota as security.[14] Hamilton Bank did not sustain any loss which may be attributed to Coscia's misrepresentations to Jarvis. Those misrepresentations occurred after Hamilton Bank had accepted the assignment of the chattel paper.

### III

### COSCIA'S COUNTERCLAIM

In a counterclaim against Hamilton Bank, Coscia alleges that: (1) he detrimentally relied upon false representations regarding the contract; (2) Hamilton Bank is subject to all claims and defenses in connection with the contract which he could assert against MLM; and (3) he has been damaged in the amount of $10,000.00. Since the court has concluded that Coscia has no obligation on the installment contract assigned by MLM to Hamilton Bank, Coscia has not sustained any actual damage.

Coscia has further alleged that Hamilton Bank violated the Truth in Lending Act (TILA), 15 U.S.C.A. § 1601 *et seq.* (1982), and Regulation Z, 12 C.F.R. § 226 (1981). Coscia contends that Hamilton Bank is not identified as a creditor, as required by 12 C.F.R. § 226.6 (1981), in the installment contract. He also alleges several other violations of the Act and Regulation including the failure to provide him with a duplicate of the retail installment contract or a state-

---

**13.** It appears that a secured creditor in Kentucky should both file a financing statement and obtain the notation of its lien on the certificate of title and registration. Note, *Security Interests In Motor Vehicles: A Conflict in Kentucky Law,* 66 Ky.L.J. 924 (1977–78).

**14.** It is not apparent whether Bank of Commerce obtained possession of the Kentucky certificate of title and registration when it advanced $2,875.00 and accepted the trust receipt on the 1977 Toyota from MLM. The point is

that Hamilton Bank did not require MLM to furnish the outstanding certificate of title and registration when it accepted the assignment of the Coscia chattel paper. The failure to do so apparently enabled MLM, which had already received $5,500.00 from the Hamilton Bank, to borrow additional money from the Bank of Commerce by presenting the Saydjari certificate of title and registration (for the 1977 Toyota) which did not reflect an outstanding lien on the vehicle.

ment containing the required disclosures.[15] It is Coscia's theory that he has incurred actual damages in the amount of $10,000.00 due to Hamilton Bank's alleged failure to comply with TILA and that he is entitled to recover his actual damages plus the lesser of twice the amount of the finance charge stated in the installment contract or $1,000.00.[16]

■ The nonenforceability of an agreement involving credit does not exonerate a creditor from liability for failure to disclose the information required by the TILA. *Dryden v. Lou Budke's Arrow Finance Co.*, 630 F.2d 641 (8th Cir.1980). Although Coscia has not sustained any actual damage, he is entitled to recover the amount provided for under § 1640(a)(2)(A) of the Act if there has been a violation.

■ Each creditor must be clearly identified if there is more than one creditor involved in a transaction. 12 C.F.R. § 226.-6(d) (1981). There is no proof in the record that Hamilton Bank was not identified as an assignee of the contract when it was executed by Coscia. The contract submitted as an exhibit at trial does identify the Bank as an assignee. Furthermore, Coscia admits that he received a confirmation statement and a payment book from Hamilton Bank subsequent to his execution of the contract. The only "violation of the truth" as between Coscia and Hamilton Bank occurred when Coscia did *not* tell the truth about the installment contract with MLM.

■ The following statement is printed in boldface type in the space immediately above Coscia's signature on the contract:

I (OR WE) CERTIFY THAT I (OR WE) HAVE EXAMINED THE ABOVE STATEMENT, THAT I (OR WE) UNDERSTAND EACH INCLUDED ITEM, AND THAT A COPY OF THIS STATEMENT WAS FURNISHED ME (OR US) UPON SALE OF THE ABOVE PROPERTY.

NOTICE TO THE BUYER: DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES. YOU ARE ENTITLED TO AN EXACT COPY OF THE CONTRACT YOU SIGN.

Coscia is neither illiterate nor uneducated. (He is a pharmacist.) The court believes that he should be estopped from denying receipt of a copy of the contract under the circumstances of this case.

■ The court has reviewed the provisions of 12 C.F.R. § 226.8 (1981) in connection with the remaining deficiencies alleged by Coscia, and the court is persuaded that there has been no violation of the TILA in this case by Hamilton Bank.

---

**15.** Specifically, Coscia contends that the contract is deficient in that it fails to:
(i) make the required disclosures in a clear, conspicuous, and meaningful sequence;
(ii) disclose the amount, or method of computing the amount, of any default or delinquency charge for late payment;
(iii) properly disclose the finance charge and annual percentage rate;
(iv) itemize certain fees and charges related to titling the automobile which secures the indebtedness;
(v) disclose the taxes for the purchase of the automobile.

**16.** The apposite provision in effect at the time of the execution of the contract by Coscia and on the date of his counterclaim provides in part:
(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
(1) any actual damage sustained by such person as a result of the failure;
(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000.00, or

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. 15 U.S.C.A. § 1640(a) (1982).

## IV

### SMITH

On March 31, 1981, a "Security Agreement and Disclosure of Transaction (Installment Sale Form for Motor Vehicles)" was executed whereby MLM sold a new 1981 Custom Ford Van (Serial No. 1FTEE14F3BHA37852), to itself. This agreement is signed on behalf of MLM, the seller, by Robert E. Johnson, President of MLM, and by Ron Johnson, as the buyer. Ron Johnson, who, as previously noted, was Vice-President of MLM, signed the agreement on two different lines. He did not indicate his official capacity on either line; he did write the word "Personal" immediately to the right of the second of his signatures. MLM is identified as the buyer of the vehicle in the body of the agreement. This agreement was assigned to Bank of Commerce. The exact consideration and date of the assignment is not revealed in the record. The gross pay-off on the MLM installment contract is $13,813.80, and the net pay-off is $11,865.56.

A lease agreement between MLM, lessor, and Ron Johnson, lessee, was also executed on March 31, 1981. The lease period is three years; the consideration is $14,400.00, payable in 36 monthly installments of $400.00 each. There is no option to purchase at the conclusion of the lease period. According to counsel for the Bank of Commerce, the rights of MLM under the lease were conditionally assigned to Bank of Commerce on June 2, 1981. The Bank of Commerce has not been receiving the payments due under the lease between MLM and Ron Johnson.

A certificate of title was issued for the 1981 van by the Tennessee Motor Vehicle Department on August 19, 1981. That certificate reflects that the van is owned by MLM and that the Bank of Commerce has a first security interest as of August 13, 1981.

The van was apparently used by Ron Johnson and his wife, Cleta Johnson, who is a cousin of the defendant Billy W. Smith. Cleta Johnson had driven the van to the home of Smith's mother on at least one occasion. Smith's mother mentioned the van to him since she knew that her son was interested in purchasing such a vehicle. Smith contacted Ron Johnson and a meeting was arranged to permit Smith to inspect the van. The vehicle had a dealer license tag and the odometer reading was between 4000 and 6000 when Smith inspected the van. It is unclear where Smith and Ron Johnson actually met, but it was at a site other than the MLM lot. Smith testified that he never saw the van on the lot of MLM.

On a date subsequent to his inspection of the van, Smith again contacted Ron Johnson. An agreement was reached for the purchase of the van, and Smith executed a "Retail Installment Contract and Disclosure Statement (Security Agreement)" on September 30, 1981. The cash sale price for the van was $15,071.76. Smith made a down payment by a check payable to MLM in the amount of $3,071.76. The balance of the purchase price was to be financed. Smith testified that he requested that Johnson submit the retail installment contract to a bank in Hamblen County. Smith agreed to finance the purchase through Hamilton Bank, but he never talked with anyone at Hamilton Bank about the financing. Smith's installment contract was assigned to Hamilton Bank, by MLM, on September 30, 1981.

Smith further testified that he realized that auto dealers ordinarily have floor plan financing. He assumed that no certificate of title had been issued on the van. He did not consider the use of the van by Ron and Cleta Johnson to be unusual since dealers often drive vehicles which they have on hand to sell. Smith also testified that Ron Johnson never mentioned either the lien of the Bank of Commerce or the lease agreement with MLM.

The Bank of Commerce has custody of the certificate of title to the van and its lien is noted thereon. Smith has neither received nor has he been able to obtain a certificate of title to the van. Including his down payment, Smith has paid more than $6,000.00 toward the purchase price of the van.

The transaction between MLM and Smith presents two issues: (1) Is Smith entitled to the protection of Tenn.Code Ann. § 47–9–307 (1979) afforded to a buyer in ordinary course under the facts of this case? (2) If so, is the prior security interest in a motor vehicle of a non-inventory financing creditor, whose lien is perfected by notation on a valid certificate of title, issued when its secured debtor, a dealer, sold the vehicle to itself, defeated by an assignee of the chattel paper subsequently executed by a buyer in ordinary course from the dealer?

Tenn.Code Ann. § 47–9–307 (1979) enacts:

*Protection of buyers of goods.*—A buyer in ordinary course of business (subsection (9) of § 47–1–201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

To attain the status of a "buyer in ordinary course of business," as statutorily defined in Tenn.Code Ann. § 47–1–201(9) (1979), one must buy:

(a) in the ordinary course,

(b) from a person in the business of selling goods of the kind purchased,

(c) in good faith, and

(d) without knowledge that the sale violates ownership rights or security interest of a third party in the goods.

Bank of Commerce contends that Smith is not entitled to the protection afforded a buyer in the ordinary course of business because: (1) Tenn.Code Ann. § 47–9–307 (1979) is designed to protect a purchaser of inventory and the van purchased by Smith was not inventory property of MLM; (2) Tenn.Code Ann. § 47–9–307 (1979) does not authorize a buyer to take free of a lease and Bank of Commerce is the assignee of a lease of the van; and (3) the van was not purchased by Smith in the ordinary course of business because none of the events culminating in the sale of the van occurred at the place of business of MLM.

■ It is unnecessary for the court to classify the van as either inventory or non-inventory. The statutory definition of buyer in the ordinary course of business does not require a conclusion that the goods purchased were inventory. The fact is that Smith purchased a motor vehicle from a seller in the business of selling goods of that kind.

■ This court also rejects the argument that Tenn.Code Ann. § 47–9–307 (1979) does not permit a buyer to take free of a lease interest created by his seller. There is no reason in this case to afford greater protection to the interest of an assignee of a lease than would be afforded to an assignee of a secured creditor. It is illogical to conclude that a buyer in ordinary course may not take free of a lease interest created by his seller if that same buyer is entitled to take free of a security interest created by his seller.

■ Smith testified that he had never seen the van in question on the lot of MLM. Standing alone, that fact is insufficient to deny Smith the protection of a buyer in ordinary course. This case is factually distinctive from *Rhode Island Hospital Trust Co. v. Leo's Used Car Exchange, Inc.*, 314 F.Supp. 254 (D.Mass.1970), in which a buyer was denied the protection of a buyer in ordinary course. The buyer purchased three automobiles on the auction lot of a third party, prior to a scheduled auction, in a state in which neither buyer nor seller was doing business. It is unclear in the record where Smith's inspection of the vehicle occurred. The site of the transfer of the vehicle is also not apparent, but there is no reason to believe that it was other than in the area of Smith's residence (Clinton) or Ron Johnson's (Morristown). It is not necessarily unusual for a sale to occur at a site other than a dealer's place of business. It is the conclusion of the court that Smith bought the van in the ordinary course of business from MLM.[17]

17. The court also rejects the argument that the sale of the Ford Van by a Lincoln-Mercury

dealer was not in the ordinary course of busi-

There is no suggestion that the sale to Smith was either a sham sale or that the price was inadequate. A familial relationship exists between Smith and the wife of Ron Johnson, a principal of the seller. However, the kinship is not a close one and the relationship between Smith and Ron Johnson appears to be less than amicable.

At the time of the sale, Ron Johnson neither disclosed nor did Smith have reason to suspect either that a title certificate had previously been issued for the van or that the van had been leased. It is common practice for the principals of an automobile dealership to drive inventory vehicles of their dealership. The van had dealer tags displayed when it was inspected by Smith and the mileage shown on the odometer was not more than 6000.

In summary, Smith bought in the ordinary course of business from a dealer in the business of selling goods of the kind which he purchased, in good faith, and without either knowledge or even suspicion that the sale was violative of the rights of any third party. Smith is the owner of the van, but he is obligated to pay the balance due on his installment contract.

Having determined that Smith purchased the van free of the security interest created by MLM (his seller) in favor of the Bank of Commerce, it is evident that Smith cannot be required to pay more than the unpaid balance remaining on his installment contract. Should this payment be made to the Bank of Commerce, whose lien was noted on the certificate of title when the van was sold by MLM to Smith, or to Hamilton Bank, the assignee of the chattel paper[18] arising from the sale of the van to Smith?

The answer to this inquiry would be elementary if the interest of the Bank of Commerce was limited to that of a floor plan financier whose interest was perfected by filing. Tenn.Code Ann. § 47–9–306(2) (1979) states:

> (2) Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

A floor plan security agreement between MLM and its financier would undoubtedly authorize MLM to sell inventory vehicles as was the case in *Crystal State Bank v. Columbia Heights State Bank,* 203 N.W.2d 389 (Minn.1973), and *Commercial Credit Corp. v. Nat'l Credit Corp.,* 473 S.W.2d 876 (Ark. 1971). If that were the case the security interest of the Bank of Commerce against the van would be terminated, and the security interest would then be limited to the proceeds from the sale of the van to Smith. These proceeds would include the down payment of $3,071.76 plus the money paid by Hamilton Bank to MLM in consideration of the assignment of the chattel paper.[19] Bank of Commerce would have to trace those proceeds in order to satisfy its interest. However, the interest of the Bank of Commerce is not so limited. Its security interest in the van was perfected at the time of the sale of the van to Smith by notation of its lien on the certificate of title.

In *Manufacturers Acceptance Corp. v. Bank of Knoxville,* 204 Tenn. 605, 324 S.W.2d 417 (1959), Redmond, a used car dealer who also conducted a driver training school, purchased a 1956 Chevrolet equipped for driver training. Bank of Knoxville, which loaned Redmond the money to pay for the car, accepted a chattel mortgage to

---

ness of the dealer in this case. Standard Lincoln-Mercury signs include the Ford emblem.

**18.** The issue is not resolved by Tenn.Code Ann. § 47–9–308 (1979), *Purchase of chattel paper and non-negotiable instruments.* Hamilton Bank is not the holder of the same chattel paper which Bank of Commerce received when MLM sold the van to itself.

**19.** Tenn.Code Ann. § 47–9–306 (1979) provides in part: *"Proceeds"—Secured party's rights on disposition of collateral.*—(1) "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of . . . . Money, checks and the like are "cash proceeds." All other proceeds are "noncash proceeds."

secure Redmond's note and obtained a title certificate with its lien duly noted thereon. Bank of Knoxville retained possession of the title certificate. Redmond removed the accessories which made the Chevrolet suitable for driver training, placed dealer tags on the vehicle, and offered it for sale with other used cars on the lot. The vehicle was sold to Haynes, who received a notarized bill of sale containing a warranty against encumbrance. A title retained contract, executed by Haynes to Redmond to secure the unpaid balance of the purchase price was purchased by Manufacturers Acceptance Corporation. Haynes was unable to obtain a title certificate because of the previously recorded and unreleased lien of the Bank of Knoxville. The Tennessee Supreme Court concluded that Bank of Knoxville was entitled to possession of the contested vehicle. Quoting from the opinion:

When Redmond did not have the certificate of title to this automobile, not only should Mrs. Haynes have been put on notice, but most certainly should the appellant, who was in business and should have been familiar with the provisions of the act. Inquiries of the Motor Vehicle Division at Nashville would have divulged the fact that Redmond had already mortgaged the automobile to the Bank of Knoxville, who had registered their lien with the Division in Nashville.

*Id.* at 419.

There is a critical factual distinction between the instant case and *Manufacturers.* The 1956 Chevrolet in *Manufacturers* was a used vehicle when it was purchased by Haynes, in 1957, from Redmond. Neither Smith nor Hamilton Bank had reason to suspect that the sale to Smith by MLM was the second sale of the 1981 van and that a title certificate had previously been issued for the van.

Bank of Commerce insists that it did all that it could do to perfect its security interest and that Smith and Hamilton Bank could have avoided any loss if they had merely required MLM to furnish proof of ownership. Although Smith might not be expected to require proof of ownership,

Hamilton Bank certainly should have required MLM to furnish either the manufacturer's certificate of origin or a certificate of title.

On the other hand, Bank of Commerce accepted a security interest in a motor vehicle from a merchant in the business of selling motor vehicles. Its interest in the *vehicle* clearly would be extinguished, by operation of Tenn.Code Ann. § 47–9–307 (1979), if Smith had paid cash for the van. Is its interest fortuitously enhanced by virtue of the fact that a portion of the purchase price was borrowed and remains unpaid? The question must be answered in the negative.

Smith is entitled to obtain a clear certificate of title to the van upon his payment of the unpaid balance on his installment contract. Payment to the Bank of Commerce would not extinguish Smith's obligation to pay Hamilton Bank. However, that obligation is enforceable by Hamilton Bank and must be satisfied by payment of the remaining balance due on Smith's contract. A contrary conclusion would nullify the protection granted to a buyer in ordinary course by Tenn.Code Ann. § 47–9–307 (1979). Thus, Hamilton Bank is entitled to receive the payments.

Bank of Commerce must note the release of its lien on the title certificate to the 1981 van and surrender the certificate to the Trustee in bankruptcy so that Smith may obtain a certificate of title reflecting a first lien in favor of Hamilton Bank.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

Submit judgment.