**In re TOM WOODS USED CARS, INC. formerly George Woods & Son, Inc. d/b/a Tom Woods Used Cars, Inc., Debtor.**

**Joseph Paul McCLOUD, Jr., and Brenda W. McCloud, Plaintiffs,**

**v.**

**Tom WOODS, Individually, Tom Woods Used Cars, Inc., formerly George Woods & Son, Inc., d/b/a Tom Woods Used Cars, First Tennessee Bank, American National Bank & Trust Company, Richard P. Jahn, Jr., trustee, Defendants.**

Bankruptcy No. 1–81–00802.

Adv. No. 1–81–0421.

United States Bankruptcy Court, E.D. Tennessee.

Sept. 21, 1982.

John Alley, Chattanooga, Tenn., for plaintiffs.

Kyle R. Weems, Weill, Ellis, Weems & Copeland, Chattanooga, Tenn., for defendant, Tom Woods.

Richard B. Gossett, Thomas, Mann & Gossett, Chattanooga, Tenn., for defendant, First Tenn. Bank.

Shields Wilson, Chattanooga, Tenn., for defendant, American Nat. Bank & Trust Co.

Hal North, Tanner, Jahn, Atchley, Bridges & Jahn, Chattanooga, Tenn., for defendant, Richard P. Jahn, Jr., Chattanooga, Tenn., Trustee.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

Shortly before its bankruptcy in April, 1981, Tom Woods Used Cars sold a car to the plaintiffs, Joseph Paul McCloud, Jr., and Brenda W. McCloud. They executed an installment sales contract which Tom Woods Used Cars sold to First Tennessee Bank in return for payment of the purchase price of the car. About the same time, the McClouds arranged financing through American National Bank and with the proceeds paid the purchase price again. Tom Woods Used Cars did not use this payment to pay First Tennessee so that American National would be the only financer with a claim against the McClouds or the car. Thus, the McClouds are apparently indebted to both banks, and First Tennessee Bank seeks to reclaim the car since it has not

been paid. The McClouds brought this action to settle the rights and liabilities between the parties. The McClouds also seek to hold Tom Woods himself liable for a debt not dischargeable in bankruptcy.

The court finds the facts as follows.

### Friday, March 13, 1981

On Friday the McClouds bought from Tom Woods Used Cars a 1979 Pontiac automobile. The McClouds dealt with Tom Woods himself.

The McClouds and Tom Woods Used Cars executed an installment sale contract under which Tom Woods Used Cars sold the car on credit. The McClouds and Tom Woods understood that the contract could or would be sold to First Tennessee Bank for cash so that Tom Woods Used Cars would be paid. The contract provided:

> 12. ORAL STATEMENTS.... The entire contract is set forth in this writing....

> ....

> 15. TRANSFER OR ASSIGNMENT. You have the right to assign any amount I owe you. You may also assign and transfer your rights under this Agreement.

The contract identified First Tennessee Bank as the assignee but the assignment on the back was not executed when the McClouds signed the contract. The bill of sale also identified First Tennessee Bank as the holder of a lien on the car.

The McClouds believed they could finance the car elsewhere at a lower interest rate. Tom Woods told them there would be no penalty for early payment of the debt due under the contract. It provided:

> 5. PREPAYMENT. I may prepay the unpaid balance at any time .... In the event of ... voluntary prepayment in full ... I will receive a rebate credit of the unearned finance charge computed in accordance with the "sum of the digits" [method].

Mr. McCloud testified that if they could not have found cheaper financing, they would have gone through with the deal as proposed.

Mr. McCloud also testified that Tom Woods promised to hold the contract while they looked for cheaper financing. Tom Woods denied making any such promise. Tom Woods also testified that he would not have destroyed the contract until he was paid.

### Monday, March 16, 1981

On Monday morning Tom Woods took the sale contract to First Tennessee Bank. Also on Monday, after checking with other potential lenders, the McClouds discovered that American National Bank would finance their purchase at a lower interest rate. Mr. McCloud called Tom Woods and told him that they were obtaining a loan from American National Bank.

### Tuesday, March 17, 1981

On Tuesday the McClouds went to American National Bank. They dealt with loan officer Carol Miller. She took the necessary information from the bill of sale that showed First Tennessee Bank as holder of a lien on the car. She did not talk to anyone at First Tennessee Bank. She testified that she called Tom Woods Used Cars. A woman who answered the telephone told her the check from First Tennessee Bank had been or would be torn up. Tom Woods' wife worked at the dealership and was probably the person to whom Carol Miller talked. Carol Miller also testified that she talked to Tom Woods who represented that he had the contract and would tear it up.

Tom Woods denied telling Carol Miller he still had the contract. He testified that he talked to her at least twice but didn't have the contract when he talked to her the first time. He didn't remember her asking about the contract. He did remember her saying that the bank would make a direct loan to pay for the car.

The check from American National Bank was written on Tuesday and made payable to Tom Woods Used Cars and the McClouds. The McClouds endorsed the check and left it at the bank to be picked up by someone from Tom Woods Used Cars.

On Tuesday, First Tennessee Bank also drew a check payable to Tom Woods Used Cars. The check was deposited to Tom Woods Used Cars' checking account on Tuesday.

### Wednesday, March 18, 1981

On Wednesday, apparently in the afternoon, Mr. McCloud went to Tom Woods Used Cars. Mr. McCloud testified that Tom Woods said he still had the sale contract and had received the check from American National Bank. The check from American National Bank was deposited on Wednesday. At the trial, Tom Woods could not explain why he didn't pay the debt to First Tennessee Bank.

### Discussion

The McClouds and American National Bank argue that the installment sale contract assigned to First Tennessee Bank is not enforceable. The argument is that the provisions for payment in installments were not to become effective and the contract was not to be assigned unless the McClouds failed within a short time to find other financing to pay for the car in full, and though the McClouds soon found other financing, Tom Woods had already wrongfully assigned the contract to First Tennessee.

Tom Woods denied that he agreed to hold the contract while the McClouds sought cheaper financing. He admitted only to telling them that after the contract was assigned they could pay the debt to First Tennessee without penalty. It is obvious that Tom Woods would not have agreed to hold the contract for an indefinite period of time while the McClouds looked for other financing. Tom Woods probably wanted the purchase price in cash as soon as possible, which required, at the least, that he be able to assign the contract if the McClouds did not quickly pay him in full.

Tom Woods' actions after the sale were entirely inconsistent with any agreement to hold the contract. By assigning the contract to the bank on Monday morning, he effectively denied the McClouds any meaningful opportunity to look for other financing before the contract was assigned. The sale was on Friday, and as a general rule many lenders are closed on weekends. Thus, Monday was the McClouds' first good opportunity to look for cheaper financing.

On the other hand, the McClouds were certain that Tom Woods agreed to hold the contract until they had a chance to look for other financing. The McClouds' actions are consistent with such an agreement. On Monday they immediately set out to find cheaper financing and found it that afternoon. Mr. McCloud then called Tom Woods and told him that on Tuesday they would get a loan to pay for the car from American National Bank.

It is arguable that the McClouds' actions were consistent with Tom Woods' version of the facts—that he only said they could pay First Tennessee without penalty after the contract was assigned. The McClouds, however, were not looking for financing to pay First Tennessee whatever might be owed under the contract. They were looking for financing to pay Tom Woods the purchase price.

A major problem with the proof of the oral agreement alleged by the McClouds is the lack of a definite period of time during which Tom Woods was supposed to hold the contract. The alleged oral agreement was, however, definite enough if Tom Woods was to hold the contract for a few days at most—necessarily through Monday since it was the first good opportunity for the McClouds to look for cheaper financing.

Finally, the McClouds and Carol Miller of American National Bank testified that Tom Woods said he still had the contract after he had assigned it. If Tom Woods did *not* agree to hold the contract, there was only reason for him to say he still had it—to obtain the payment from American National Bank for himself rather than allowing American National to pay First Tennessee. On the other hand, if Tom Woods agreed to hold the contract, he might have simply been trying to hide his breach of the agreement, even though he intended to pay First Tennessee with the money from American National.

■ The court believes that Tom Woods probably did "agree" to hold the contract long enough to give the McClouds an opportunity to look for cheaper financing. Though Tom Woods may never have expressly said he would hold the contract, he doubtlessly knew that the McClouds thought he had agreed to hold the contract. In such a situation, the McClouds' understanding of the agreement was the agreement.

Nevertheless, the "parol evidence rule" may make the oral agreement unenforceable and the written contract controlling. The applicable parol evidence rule is § 2–202 of the Uniform Commercial Code as enacted in Tennessee. Tenn.Code Ann. § 47–2–202. It provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
> (a) by course of dealing or usage of trade ... or by course of performance ... and
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

■ Consistent additional terms can be proved unless the court finds the contract was intended as the "complete and exclusive" expression of the parties' agreement. The court believes, however, that the oral agreement is inconsistent with the written agreement. It is not contradictory. Thus, the oral agreement can be proved if the written contract was not intended as the

"final expression" of the parties' agreement.

■ Whether a writing was intended as a final expression of the parties' agreement is determined in the first instance by considering the writing itself. The written contract in question is complete in all important respects, including the payment provisions in question. Such completeness is proof that the contract was intended as a final expression of the parties' agreement with respect to the terms included in the writing. *Kearly v. Duncan*, 38 Tenn. 397 (1858); *Price v. Allen*, 28 Tenn. 703 (1849); *American Fruit Growers, Inc. v. Hawkinson*, 21 Tenn.App. 127, 106 S.W.2d 564 (1937). See also Restatement (Second) of Contracts § 209(3) (1981).[1]

■ It has been held that such a writing is *presumed* to be the final expression of the parties' agreement with respect to the terms included in the writing. *Kearly v. Duncan; Price v. Allen; American Fruit Growers, Inc. v. Hawkinson;* cited above. The statutory parol evidence rule allows such a presumption.[2] Indeed, it appears to be the heart of the parol evidence rule, and the drafters of the statute doubtlessly did not mean to do away with it.

■ The Tennessee cases hold that the presumption is conclusive. *Kearly v. Duncan; Price v. Allen; American Fruit Growers, Inc. v. Hawkinson;* cited above. Thus, proof of inconsistent oral agreements cannot be used even to show that the writing was not intended as a final expression of the parties' agreement.

The better rule is that the presumption is not conclusive. Otherwise, the courts will at times be compelled to make the writing the parties' contract despite other evidence clearly showing that they did not intend it to be. See *Lakeside Bridge & Steel Co. v.*

---

1. "Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final express."

2. The statute only disallows a presumption that a contract, because it is in writing, is the "complete and exclusive" expression of the parties' agreement. UCC § 2–202(b) & Official Comments 1(a) and 3.

*Mountain State Construction Co.,* 400 F.Supp. 273, 17 UCC Rep.Serv. 917 (E.D. Wis.1975); Restatement (Second) of Contracts §§ 209 & 213 (1981); 3 Corbin on Contracts § 573 (1960). But this is apparently not the rule in Tennessee. The presumption is conclusive. The result is that the oral agreement between the McClouds and Tom Woods cannot be given effect.

■ The court also concludes that the oral agreement cannot be proved as a condition to the contract. Compare *Capitol Airways, Inc. v. Airline Pilots Ass'n,* 237 F.Supp. 373 (M.D.Tenn.1963), aff'd in part, rev'd in part, 341 F.2d 288 (6th Cir. 1965), and *United States ex rel. T.V.A. v. Easement & Right-of-Way Over Certain Land,* 271 F.Supp. 55 (E.D.Tenn.1966); *Seaton v. Dye,* 37 Tenn.App. 323, 263 S.W.2d 544 (1954). The rule apparently is that when the parties agree to an oral condition to one party's performance, and thus to the other party's performance, the condition is provable. The rule developed to cover a recurring situation in which the writing clearly was not intended as a final expression of the parties' agreement. Restatement (Second) of Contracts § 217 (1981).

This case does not present such a situation. Tom Woods Used Cars delivered the car to the McClouds. Likewise, there was no condition to the McClouds' obligation to pay. What is in question is the method of payment provided for in the written contract and the assignability of the contract. The rule allowing proof of a condition to a contract is not applicable in this situation. See cases cited above.

■ The court's conclusions necessarily raise the question of whether the written contract is void for fraud on the ground that Tom Woods obtained the McClouds' signatures by leading them to believe he would hold the contract when he did not intend to do so. At best, Tom Woods' immediate assignment of the contract allows an inference that he never intended to hold it, but this is slight proof and does not meet the standard for proving fraud. *Wry v. Cutler,* 59 Tenn. 28 (1873); *Mayberry v. Nichol,* 39 S.W. 881 (Tenn.Ch.App.1896);

*Walter v. Blackman,* 36 S.W. 195 (Tenn.Ch. App.1896).

■ The evidence is more convincing that Tom Woods obtained the cash payment from the McClouds by misleading them to believe he had not assigned the written contract to First Tennessee. He assigned the contract to First Tennessee on Monday morning and no doubt expected payment from First Tennessee to be received no later than Tuesday. On Monday afternoon Mr. McCloud told him that on Tuesday American National was going to lend them the cash to pay for the car in full. He did not tell Mr. McCloud that he had assigned the contract despite his agreement to hold it. On Tuesday the check from First Tennessee was received, and instead of being held, was deposited to Tom Woods Used Cars' checking account. Also on Tuesday, Tom Woods told Carol Miller of American National that he still had the contract. On Wednesday the check from American National was received and deposited, and Tom Woods again told Mr. McCloud that he still had the written contract. Tom Woods could not give any reason why he failed to pay First Tennessee after he received the cash payment from the McClouds.

The court concludes that Tom Woods intentionally misled the McClouds and American National Bank into paying him directly. Furthermore, the court concludes that the McClouds and American National reasonably relied on his representations that the assignment transaction with First Tennessee had not been completed. It would have been better if either the McClouds or American National had checked with First Tennessee before delivering the check to Tom Woods endorsed so that he could freely negotiate it. The McClouds, however, had no reason to believe that Tom Woods had reneged on his agreement to hold the contract. Tom Woods' wrongdoing in immediately assigning the contract cannot protect him from the consequences of his further wrongdoing in concealing the assignment.

American National Bank did not ask that Tom Woods be held liable to it for a nondis-

chargeable debt, but the McClouds did. The court is of the opinion that the check from American National Bank was obtained both from the McClouds and the bank so that Tom Woods may be liable to either for obtaining the money through fraud or false pretenses or false representations. The check was the proceeds of a loan obtained by the McClouds and which they were obligated to repay. It was their money once the loan was made. Furthermore, the check was jointly payable so that Tom Woods could rightfully negotiate it only with the McClouds' endorsements.

Tom Woods argues that he cannot be liable to the McClouds for a nondischargeable debt because the money obtained was not for his benefit but for the benefit of Tom Woods Used Cars, *Incorporated.* The better view is that the debtor need not have obtained the money for himself in order for the debt to be nondischargeable. 1A Collier on Bankruptcy ¶ 17.16[1] (14th ed. 1978). The rule must rest on the common sense conclusion that a person will seldom go to the trouble of obtaining money by wrongful means unless the person realizes some benefit for himself, though the money actually goes to another. Furthermore, in this case Tom Woods sought to excuse his wrongdoing by implying that the business was a small operation run by him and his wife and subject to unintentional oversights (generally to the business's benefit it appears). He should not be allowed to excuse his wrongdoing now on the ground that the business was truly a separate entity and payments to it were of no benefit to him.

The result is that Tom Woods is liable to the McClouds for a debt not dischargeable in bankruptcy as provided in 11 U.S.C. § 523(a)(2)(A).[3]

In summary, the court has concluded that First Tennessee Bank has the superior claim to the car and the McClouds are rightfully indebted to First Tennessee and that Tom Woods is liable to the McClouds

for a nondischargeable debt for obtaining the cash payment from them through false representations. This leaves several questions. First is the question of the amount of Tom Woods' liability to the McClouds. In the circumstances, it is only fair that he be liable for the full amount originally owed by the McClouds to American National Bank without deduction of the amounts paid by the McClouds.

The remaining question regards the disposition of the money paid to American National. The McClouds were justly indebted to the bank from the time the loan was made. The court sees no ground upon which they can recover the payments or First Tennessee can be entitled to them.

Finally, First Tennessee asked for a judgment giving them possession of the car as first lienholder because they have not been paid. It was admitted that no payments have been made to First Tennessee. First Tennessee is entitled to possession for breach of the installment sale contract. The judgment will be entered accordingly.

The memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.

---

3. "A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for obtaining money ... by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition ...."