**In re Darrell Franklin McFARLAND, Brenda Kay McFarland, Debtors.**

**John F. WEAVER, Trustee, Plaintiff,**

v.

**FORD MOTOR CREDIT COMPANY, Defendant.**

Bankruptcy No. 3–88–02464.
Adv. No. 3–89–0081.

United States Bankruptcy Court,
E.D. Tennessee.

Feb. 12, 1990.

John F. Weaver, Knoxville, Tenn., trustee.

Steven D. Lipsey, Knoxville, Tenn., for Ford Motor Credit Co.

Perry P. Paine Jr., Maryville, Tenn., for T T Enterprises.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

The chapter 7 trustee has brought an action seeking to avoid as preferential transfers the security interests held by defendant Ford Motor Credit Company ("Ford Motor") on two automobiles. Having considered the evidence introduced at the trial of this case, together with the briefs filed by the parties, the court now submits its findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### I.

Prior to September 2, 1988, the debtors, Darrell McFarland and Brenda McFarland, owned a 1987 Nissan 300ZX. As of September 2, 1988, Home Federal Savings & Loan of Knoxville ("Home Federal") held a lien on the Nissan securing a loan in excess of $19,000.

Due to a change in the work schedule of Darrell McFarland, the debtors found they needed two cars. They decided to trade the Nissan automobile and obtain two new automobiles provided they could arrange for the combined monthly payments on the two new vehicles to approximate the payments on the Nissan. Consequently, the debtors went to Gary Yeomans Ford ("Gary Yeomans") and discussed their proposal with salesman Mark Cohen. The discussion eventually led to an agreement whereby the debtors agreed to purchase a 1988 Ford Escort and a 1988 Ford Bronco II upon the condition that the debtors could obtain approved financing through Ford Motor. To effectuate the agreement, the debtors on September 2, 1988, executed "Car Buyer's Offer and Purchase Option Contract" ("purchase option contracts") for both new automobiles. These agreements stated the price the debtors would pay for the new vehicles if they exercised their options to purchase. To exercise their options, the debtors could pay in cash the agreed sums or, in the words of the option agreements, they could execute "a retail installment sales contract subject to acceptance of such contract by a lending institution acceptable to Seller and payment in cash or equivalent...."[1] The debtors were unable to pay cash, so before leaving Gary Yeomans on September 2, 1988, they executed "Tennessee Vehicle Retail Installment Contract[s]" ("installment contracts") for each new vehicle.

Both installment contracts, dated September 2, 1988, expressly advised the debtors in bold print that "[b]y signing this contract you choose to buy the vehicle on credit under the agreements on the front and back of this contract." The contracts also recited "[b]y signing below, the seller accepts this contract." The contracts were signed by an agent of Gary Yeomans.

Aside from the representations contained in the two purchase option contracts, the debtors and representatives of Gary Yeomans orally agreed that the installment contracts were subject to Ford Motor's financing both vehicles. The debtors were not interested or able to complete the sale if financing were approved for only one vehicle.[2] The retail installment contracts

---

1. Although the purchase option contract covering the Bronco was not executed by a representative of Gary Yeomans, this fact is not significant in the resolution of this case.

2. Evidence of the oral agreement between the debtors and Ford Motor is not precluded by the parol evidence rule in this case. *See* Tenn.Code Ann. § 47–2–202 (1979) (if writings not intended as complete and exclusive statement of

expressly provided the purchasers were giving security interests in the vehicles.

After the debtors had executed the purchase options and installment contracts, Gary Yeomans retained the debtors' Nissan and the debtors were given the new automobiles to take home. No mileage restrictions or driving limitations were placed upon the debtors' use of the new automobiles.

On or about September 6, 1988, Ford Motor received from Gary Yeomans via computer the request for financing the new automobiles. After financial and credit evaluations, Ford Motor agreed to finance the purchase of the Escort. Ford Motor did not agree, however, to finance the purchase of the Bronco. Through further negotiations with Gary Yeomans and after Gary Yeomans agreed to guarantee $2,500 of the purchase price, Ford Motor finally agreed on September 15, 1988, to finance the Bronco. The installment contracts executed by the debtors were then assigned from Gary Yeomans to Ford Motor.

During the period of time between September 2 and September 15, 1988, while financing was still pending, Darrell McFarland temporarily ceased using the Bronco fearing he would be unable to obtain financing. It appears that on September 15, 1988, the day Ford Motor agreed to finance the purchase of the Bronco, the debtors and Gary Yeomans were preparing to reexchange vehicles believing that financing on the Bronco would not be obtained.

On September 16, 1988, Gary Yeomans issued a check for $19,326.63 to Home Federal to pay the outstanding balance on the lien on the Nissan.

With financing approved on both vehicles, Gary Yeomans submitted applications for Tennessee certificates of title on the vehicles. The application for title on the Bronco was submitted September 19, 1988. The application for the Escort was submitted September 21, 1988. Both applications listed Ford Motor as the first lienholder.

On October 28, 1988, certificates of title were issued for both vehicles. Ford Motor is listed as first lienholder on both titles and the certificates each list September 2, 1988, as the lien date.

On September 28, 1988, the debtors filed a joint petition in bankruptcy under chapter 7 of the Bankruptcy Code. The plaintiff was appointed trustee in the debtors' chapter 7 case. The plaintiff estimated that unsecured creditors would be paid approximately 33–36% of the value of their claims after administrative expenses were deducted. From the uncontroverted testimony of Brenda McFarland, it appears at all relevant times the total of the debtors' debts exceeded the total value of the debtors' assets. Schedules A and B filed with the debtors' chapter 7 petition show debts of $38,690.43 and assets of $23,920.

The plaintiff contends that Ford Motor received preferential transfers of security interests in the debtors' automobiles. According to plaintiff's argument, the debtors acquired rights in the two Ford vehicles on September 2, 1988, and granted security interests in the vehicles at that time. Because perfection of the security interests in the two vehicles did not occur until September 19 and 21, when the applications for title were submitted, the transfers of security interests are deemed to have taken place at that time pursuant to the provisions of 11 U.S.C.A. § 547(e)(2). Thus, plaintiff contends the debt incurred by the debtors was antecedent to the transfer of the security interests, creating preferences which are avoidable by the plaintiff.

Ford Motor maintains it received no preferential transfer in this case. Ford Motor asserts that the debtors and personnel at

terms, consistent supplementary oral term may be proven); *see also Hamilton Bank v. Bank of Commerce (In re Morristown Lincoln–Mercury)*, 25 B.R. 377, 383–384 & n. 9 (Bankr.E.D.Tenn. 1982) (citing *Hull–Dobbs, Inc. v. Mallicoat,* 57 Tenn.App. 100, 415 S.W.2d 344 (Tenn.Ct.App. 1966)) (contemporaneous oral inducements to contract not contradicting written agreement not precluded by parol evidence rule); *McCloud v. Woods (In re Tom Woods Used Cars)*, 23 B.R. 563, 568 (Bankr.E.D.Tenn.1982) (oral agreement of condition to contract may be proven notwithstanding parol evidence rule); *Strickland v. City of Lawrenceburg,* 611 S.W.2d 832, 838 (Tenn.Ct. App.1980) (parol evidence may be admitted to show a condition precedent).

Gary Yeomans agreed that a condition precedent to the sale of the two vehicles was that Ford Motor would finance the purchase of both vehicles. Ford Motor argues until September 15, 1988, the date financing was approved for both vehicles, the debtors only had possession of the two Ford vehicles and that their mere possessory interest in the vehicles was insufficient to convey a valid security interest. Ford Motor contends that perfection of its security interests took place within ten days of September 15, 1988, and that under § 547(e)(2)(A), the transfers of the security interests would be deemed to have occurred on September 15, 1988, contemporaneously with the date the debtors incurred the debt.

## II.

The elements of a preferential transfer are set forth in 11 U.S.C.A. § 547(b) (West 1979 & Supp.1989).[3] The primary issue in this proceeding is whether Ford Motor received a transfer of an interest of the debtor in property (the security interests) "for or on account of an antecedent debt owed by the debtor before such transfer was made." *See* 11 U.S.C.A. § 547(b)(2) (West 1979).

To solve the legal issue presented, the court must first discover the date of the transfer for purposes of § 547. Once that date has been determined, the court can then ascertain whether the transfer was on account of an antecedent debt owed by the debtors.

The two installments contracts signed by the debtors and Gary Yeomans purport to transfer security interests in the two new automobiles to Gary Yeomans on September 2, 1988. For purposes of § 547, however, the timing of a transfer is governed by § 547(e). Section 547(e) provides in relevant part as follows:

(2) For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; or

. . . .

(3) For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred. ·

11 U.S.C.A. § 547(e)(2), (3) (West 1979).

A proper application of § 547(e) to the facts of this case requires an initial determination of whether a transfer was effectively made on September 2, 1988. Or, to pose the question more specifically, did the debtors actually convey attachable security interests as of that date? Legislative history makes clear the drafters intended the phrase "takes effect between the transferor and the transferee" to be synonymous with the term "attachment" as used in the context of security interests under article 9 of the Uniform Commercial Code. See H.R.Rep. No. 595, 95th Cong. 1st Sess. 213 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6173.

The attachability of security interests is governed by Tennessee Code Annotated § 47–9–203(1) (Supp.1989). That statute reads as follows:

**3.** (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C.A. § 547(b) (West 1979 & Supp.1989).

[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and

(b) the value has been given; and

(c) the debtor has rights in the collateral.

*Id.* Notably, the requirement that the debtor have rights in the collateral as set out in subsection (c) above is similar to the requirement in § 547(e)(3) mandating that before there can be a transfer for purposes of § 547, the debtor must have acquired rights in the property transferred. See 11 U.S.C.A. § 547(e)(3) (West 1979).

Clearly, the first two requirements necessary for the security interests to attach and become enforceable were present as of September 2, 1988. First, the debtors signed a proper security agreement on September 2, 1988. Second, on that same date, Gary Yeomans gave value by promising to sell the vehicles to the debtors at a specified price and by delivering the vehicles into debtors' possession. *See* Tenn.Code Ann. § 47–1–201(44) (Supp.1989) (value means *inter alia*, any consideration sufficient to support a simple contract). The remaining question is whether on September 2, 1988, the debtors had rights in the collateral.

The phrase "rights in the collateral" is not defined in the Uniform Commercial Code (codified at title 47 of the Tennessee Code) or in the Bankruptcy Code. Most courts construing the phrase have recognized that "rights in the collateral" encompass almost any rights in the collateral that a debtor may have. *See* 2 J. White & R. Summers, *Uniform Commercial Code* § 24–6, at 322–23 (3d ed. 1988). Although mere acquisition of possession of property entirely owned by a third party will not be

enough, courts have held that "rights in the collateral" can be property rights which are less than full ownership rights. When a debtor has rights in the collateral, he may convey a security interest which attaches to the extent of those rights. *See, e.g., See Kinetics Technology Int'l Corp. v. Fourth Nat'l Bank,* 705 F.2d 396 (10th Cir.1983) (attachment when debtor has possession and degree of control or authority over collateral); *Goldberg Co. v. County Green Ltd. Partnership (In re County Green Ltd. Partnership),* 438 F.Supp. 693 (W.D. Va.1977) (security interest attaches with possession and contingent rights of ownership); *Amfac Mortgage Corp. v. Arizona Mall,* 127 Ariz. 70, 618 P.2d 240 (Ariz.Ct. App.1980) (possession with contingent rights of ownership was sufficient for attachment); *Rex Financial Corp. v. Mobile America Corp.,* 119 Ariz. 176, 580 P.2d 8 (Ariz.Ct.App.1978) (attachment when good-faith purchaser executed installment purchase agreement and security agreement); *Thrift, Inc. v. A.D.E., Inc.,* 454 N.E.2d 878 (Ind.Ct.App.1983) (rights in collateral where debtor acquires possession pursuant to a contract); *Uniroyal v. Michigan Bank,* 12 U.C.C.Rep.Serv. (Callahan) 745 (Mich.Cir.Ct.1972) (rights of exclusive use, control, and possession sufficient to constitute rights in collateral); *Borg–Warner Acceptance Corp. v. C.I.T. Corp.,* 679 S.W.2d 140 (Tex.Ct.App.), *reh'g denied* (1984) (buyer had rights in collateral where temporary possession was taken under a conditional sales contract); 2 J. White & R. Summers, *supra,* p. 10, § 24–6, at 322–23.

The agreements entered into by the debtors and Gary Yeomans on September 2, 1988, were valid contracts that came into existence on that date. Gary Yeomans agreed to sell the Escort and Bronco to the debtors for a certain price and the debtors obligated themselves to buy the automobiles provided the financing was approved. The obligations of the parties were created and arose on September 2, 1988; the performance of the obligations under the contracts was conditional upon financing. The obligations were subject to a condition, or what some have called a condition precedent.

The *Restatement (Second)* definition of conditions, quoted with approval in *Covington v. Robinson*, 723 S.W.2d 643, 645 (Tenn.Ct.App.1986), recites that a condition is:

[A]n event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.

Restatement (Second) of Contracts § 224 (1981). Corbin defines conditions precedent as follows:

Conditions precedent, for our present purposes, are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.

A. Corbin, *Corbin on Contracts* § 628, at 587 (one vol. ed. 1952).

In both the *Restatement (Second)* definition of conditions and Corbin's definition of conditions precedent, the existence of a valid contract is presupposed. As Farnsworth explains in his treatise on contracts:

The Restatement Second uses *condition* in the context of an existing contract. It excludes events, such as the acceptance of an offer, that must occur before a contract is made. For example, if an offeror makes a promise in the form of an offer "to sell this cotton to you on condition that you pay me $1,000," the payment is regarded as acceptance of the offer but not as a condition of the promise. Although formation of the contract could be said to be conditional on payment of the $1,000, no contract exists until payment is made. Under the Restatement Second definition, the making of the contract marks the border between the law of offer and acceptance, which relates to the formation stage, and the law of conditions, which relates to the performance stage. The line is a fine one, however. If parties make a contract under which neither has a duty to perform until the occurrence of some event, such as the raising of a stated amount of capital or the approval of a third person, that event is a condition of the duty of each party. Both parties are bound, although neither will have to perform if the event does not occur. Similarly, if an offer has become an option contract by, for example, the payment of a dollar or the use of a signed writing, acceptance of that offer is a condition of the offeror's duty. The grantor of the option is bound although he will not have to perform if the option is not exercised.

E. Farnsworth, *Contracts* § 8.2, at 540–41 (1982) (emphasis in original) (footnotes omitted).

The contracts entered into between the debtors and Gary Yeomans on September 2, 1988, were binding, valid contracts. If, for instance, the debtors had attempted to return the vehicles the day after executing the contracts before the application for financing could be acted upon, Gary Yeomans would have had an action for breach of contract against the debtors. Similarly, if a day after the contracts were executed Gary Yeomans had repossessed the vehicles and sold them to another party prior to the time the application for financing could be acted upon, Gary Yeomans would have been liable for breach of contract.

The contracts entered into between Gary Yeomans and the debtors on September 2, 1988, provided the debtors sufficient "rights in the collateral" to enable them to transfer attached security interests to the extent of the value of those rights. The nature of those rights are set forth in chapter 2 of the Uniform Commercial Code enacted in Tennessee. The particular Code section of chapter 2 applicable here is found at Tennessee Code Annotated § 47-2-501 (1979). It reads as follows:

(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In

the absence of explicit agreement identification occurs:

(a) when the contract is made if it is for the sale of goods already existing and identified.

*Id.* Other property rights in the collateral flowing from the execution of the sales contracts which existed even prior to the delivery of the vehicles include the debtors' right, upon tender of the balance of the purchase price, to obtain the vehicles in the event of the seller's insolvency, Tenn.Code Ann. § 47–2–502 (1979); the debtors' ability, under certain circumstances, to recover the vehicles, obtain specific performance, or replevy the vehicles, *id.* §§ 47–2–711(2)(a), (b), 47–2–716; and debtors' right of action against a third party for injury to the vehicles, *id.* § 47–2–722. *See In re Pelletier,* 5 U.C.C.Rep.Serv. (Callaghan) 327 (D.Me.1968).

Although the special property and insurable interest given to the debtors by Tennessee Code Annotated § 47–2–501 was very limited, the rights are nonetheless rights in the collateral. Moreover, § 47–2–401(1) addresses the interest a seller retains upon delivery of possession of goods to a buyer pursuant to a contract for sale. It reads:

Each provision of this chapter with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (§ 47–2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by chapters 1 through 9 of this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the chapter on Secured Transactions (chapter 9 of this title), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

Tenn.Code Ann. § 47–2–401(1) (1979). Regardless of the agreement between the buyer and seller concerning title and ownership of the goods, under § 47–2–401 once those goods have been delivered into the possession of the buyer under a sales contract, the most the seller can retain is a security interest. *See, e.g., Jahn v. Quintrell (In re Tom Woods Used Cars),* 21 B.R. 560 (Bankr.E.D.Tenn.1982); *see also In re Phillips,* 77 B.R. 648 (Bankr.E.D.Tenn. 1987).

In summary, on September 2, 1988, the debtors had rights in the new automobiles pursuant to the installment contracts executed by Gary Yeomans and the debtors. The debtors' rights in the two vehicles constituted more than mere possession and were sufficient to permit attachment and the conveyance of security interests as of September 2, 1988. Additionally, pursuant to the terms of Tennessee Code Annotated § 47–2–401(1), because the vehicles were delivered into the debtors' possession under sales contracts, Gary Yeomans could only retain security interests in the vehicles. Since the security interests were not perfected within ten days of their attachment, § 547(e)(2)(B) applies and deems the transfer of the security interests as taking place on September 19 and 21, respectively. *See* Tenn.Code Ann. § 55–3–126(a) (1988) (date of perfection relates back to date application for title is filed). The performance of the installment contract obligations, including payment of the debt, did not arise until September 15, 1988, the date financing was approved on the second vehicle. Even if this date were held to be the date the debt was incurred, the transfer of the security interests were still on account of an antecedent debt. As all other elements of § 547(b) preferential transfers are present, the court determines that the security interests held by Ford Motor in the debtors' vehicles are preferential transfers and are

avoidable by the trustee.[4] Judgment will enter in favor of the plaintiff.

---

**4.** The enabling loan exception set forth in § 547(c)(3) of the Bankruptcy Code is not helpful to the defendant. *See* 11 U.S.C.A. § 547(c)(3) (West 1979 & Supp.1989). First, it is doubtful the exception was meant to apply to sellers such as Gary Yeomans who retain a purchase-money security interest to secure the purchase price of goods sold. *See* Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand.L.Rev. 713, 776–81 (1985). *But see Gower v. Ford Motor Credit Co. (In re Davis)*, 734 F.2d 604 (11th Cir.1984); *Waldschmidt v. Ford Motor Credit Co. (In re Murray)*, 27 B.R. 445, 448 (Bankr.M.D.Tenn.1983); *General Motors Acceptance Corp. v. Martella (In re Martella)*, 22 B.R. 649, 651 (Bankr.D.Col.1982). Secondly, the exception requires that the creditor perfect its security interest within ten days of the time the debtor receives possession of the property. *See* 11 U.S.C.A. § 547(c)(3)(B) (West Supp.1989). Perfection did not occur within that ten-day period in this case.