**In re Delwin J. WALKER and Billie Janiece Walker, Debtors.**

**L.D. FITZGERALD, Trustee, Plaintiff,**

v.

**FIRST SECURITY BANK OF IDAHO, N.A., Defendant.**

Bankruptcy No. 92–02863.
Adv. No. 93–6020.

United States Bankruptcy Court, D. Idaho.

Dec. 3, 1993.

Jim Spinner, Service, Gasser & Kerl, Pocatello, ID, for plaintiff.

Craig W. Christensen, Pocatello, ID, for defendant.

MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

FACTS.

The facts in this case are derived from a Stipulation of Facts submitted to the Court, which also contains certain documentary exhibits. A review of the Stipulation and exhibits shows that on July 3, 1992, Debtors Delwin and Janiece Walker purchased a 1989

Ford Taurus from Ted's, Inc. (Ted's), a Pocatello auto dealer. In connection with the purchase, Debtors executed an Installment Sale Contract, Security and Disclosure Agreement (the Contract). In the Contract, Debtors granted a security interest in the vehicle to Ted's to secure the payment of the $9,042.18 balance of the purchase price they agreed to finance.

Debtors took physical possession of the car the same day. Also on July 3, Ted's executed an assignment form on the back of the Contract and transferred all of its right, title, and interest under the Contract without recourse to Defendant First Security Bank of Idaho, N.A.

On July 6, 1992, Ted's sent by regular mail to the Bannock County office of the Idaho Department of Motor Vehicles (Bannock County) the following documents:

(a) the notarized Bill of Sale;

(b) Report of Sale and Application for certificate of Title;

(c) Odometer Disclosure Statement; and

(d) Out of State (Florida) Motor Vehicle Title.

Upon review of these documents, Bannock County determined there was an error in the motor vehicle identification number in one of the documents and returned them to Ted's.

Upon receipt of the returned documents, Ted's corrected the identification number and resubmitted the documentation to Bannock County. The parties' Stipulation does not state the date Ted's resubmitted the documents to Bannock County, nor is there a stipulation as to the date the documents were again received by Bannock County. There is, however, a handwritten circled notation on the face of the Report of Sale and Application for Certificate of Title stating: "7.17.92; 9:00" followed by certain illegible initials. In their arguments to the Court the parties have presumed, and to the extent necessary herein the Court adopts their presumption as a finding of fact, that such notation was placed upon the document by an employee of Bannock County and correctly indicates the date and time the documents were received a second time by Bannock County.

Bannock County thereafter submitted the documents to the Department of Motor Vehicles in Boise for issuance of a State of Idaho certificate of motor vehicle title. The title issued by the State shows the Debtors as owners of the auto and Defendant as the lienholder. The title certificate further shows a "print date" of July 23, 1992, and that Defendant's lien was "recorded" on July 17, 1992.

Debtors stopped making payments on the vehicle and filed a Chapter 7 bankruptcy petition with this Court on September 2, 1992. Later, Debtors surrendered the vehicle and pursuant to an agreement of the parties, it was sold by Plaintiff Trustee L.D. Fitzgerald at an auction. This sale generated $4,835 in proceeds which are being held in Plaintiff's trust account pending resolution of this action.

## STATUS OF THE CASE AND BACKGROUND.

Plaintiff instituted this adversary proceeding to avoid the Debtors' transfer of the security interest in the vehicle to Ted's and the Defendant pursuant to Sections 544 and 547(b)[1] of the Code. The parties have agreed to reserve further action on the Section 544 claim until after determination of the issues arising under the Section 547 preference claim.

---

1. § 547. **Preferences.**

.    .    .    .    .

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

In their Stipulation the parties also agreed, and the Court concurs, that only one element of the alleged preference claim under Section 547(b) remains unresolved. *See* Stipulated Facts, ¶ 16. The sole undecided preference element concerns whether the transfer of the security interest in the vehicle from the Debtors to Defendant was "for or on account of an antecedent debt." *See* 11 U.S.C. § 547(b)(2). Additionally, Defendant has asserted an affirmative defense to the preference claim which must be addressed by the Court arguing that the transfer of the security interest in this case is protected by the so-called "enabling loan" exception to preference avoidance. 11 U.S.C. § 547(c)(3).[2]

■ In resolving both of the remaining legal issues, the Court must determine when, for preference purposes, the "transfer" of the security interest from Debtors to Defendant occurred. A transfer of a security interest made on account of an antecedent debt is avoidable in bankruptcy by a trustee as a preference.[3] It is thus imperative that Plaintiff show that the transfer of the security interest took place, legally, at some time after the creation of Debtors' obligation to finance the purchase of the vehicle.[4]

Similarly, Congress excepted purchase money security interests from avoidance, but only if the creditor can demonstrate that the transfer of the security interest was "perfected on or before 10 days after the debtor receives possession of such property." 11 U.S.C. § 547(c)(3)(B). The transfer date of the security interest is therefore also crucial in determining whether Defendant can take advantage of this defense.

■ Fixing the date of the transfer under the preference statute in this case presents the Court with a considerable challenge in interpreting the Code. Section 547(e)[5] provides the general rules concerning the date a transfer occurs for preference purposes. While the language of these provisions is complex, simply stated the statutes dictate that a transfer is deemed made at the time it

---

2. § 547. **Preferences.**

. . . .

(c) The trustee may not avoid under this section a transfer—

. . . .

(3) that creates a security interest in property acquired by the debtor—

(A) to the extent such security interest secures new value that was—

(i) given at or after the signing of a security agreement that contains a description of such property as collateral;

(ii) given by or on behalf of the secured party under such agreement;

(iii) given to enable the debtor to acquire such property; and

(iv) in fact used by the debtor to acquire such property; and

(B) that is perfected on or before 10 days after the debtor receives possession of such property;

3. The term "transfer" is defined broadly in bankruptcy, and expressly includes the granting of a security interest in the debtor's property in favor of a third party. 11 U.S.C. § 101(58)[54].

4. Debtors' execution of the contract on July 3, 1992, including, among other obligations, Debtors' promise to pay the financed portion of the purchase price, created a "debt" in favor of the Defendant as that term is defined in the Code. 11 U.S.C. § 101(12), (5).

5. § 547. **Preferences.**

. . . .

(e)(1) For the purposes of this section—

(A) a transfer of real property other than fixtures, but including the interest of a seller or purchaser under a contract for the sale of real property, is perfected when a bona fide purchaser of such property from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest that is superior to the interest of the transferee; and

(B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

(2) For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; or

(C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of—

(i) the commencement of the case; or

(ii) 10 days after such transfer takes effect between the transferor and the transferee.

(3) For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

takes effect between the parties *if* it is perfected within ten days thereafter. 11 U.S.C. § 547(e)(2)(A). If it is not perfected within ten days, the transfer is deemed to have occurred when it is perfected. 11 U.S.C. § 547(e)(2)(B).

There is, therefore, a ten day "grace period" of sorts in the statute. If the creation of the debt occurred at the same time the transfer took effect between the parties, perfection within the grace period will insulate the transfer from avoidance because the statute will regard the transfer as has having occurred simultaneously with the creation of the underlying debt. In other words, no preference can be shown to have occurred because there will not be a transfer on account of an antecedent debt.

The issue under the enabling loan exception to avoidance is similar, but not identical. In order for the statute to apply, the transfer must be perfected within ten days of the date the debtor receives possession of the collateral. 11 U.S.C. § 547(c)(3)(B). In a situation where the debtor does not receive possession of the property at the time the security agreement is executed, for example, a transfer may still be protected from avoidance even if it is perfected more than ten days after the effective date of the security agreement, so long as the perfection date is not more than ten days from the date of the debtor's taking possession of the property.

In the facts before the Court here, however, because Debtors received the vehicle on the same date they signed the Contract, if the transfer of the security interest was perfected within ten days of that date (i.e. July 3, 1992), the security interest is unavoidable under both statutes.

To ultimately conclude whether the transfer is avoidable, the Court must answer the following question: At what point in time was the transfer of the security interest in the car granted by Debtors to Defendant

"perfected" for purposes of Section 547 of the Bankruptcy Code? Congress also provided a statutory basis to answer this question. As will be seen, however, this determination is not a simple one.

■ Section 547(e)(1)(B) declares that:

a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

11 U.S.C. § 547(e)(1)(B). The Bankruptcy Code does not control when this hypothetical judicial lien creditor's rights become superior to the rights of the transferee. Rather, the Court must consult state law in its analysis. 4 L. King, Collier on Bankruptcy, ¶ 547.16[2], p. 547–68 (15th ed. 1992); *In re Gulino*, 779 F.2d 546, 550 (9th Cir.1985). In this case, the Court must establish the date on which Defendant obtained state law rights which would defeat a competing judicial lien creditor under state law. However, while state law controls when Defendant's security interest was perfected as against a hypothetical judicial lien creditor, the Bankruptcy Code determines the consequences of that finding for preference purposes. *In re Holloway*, 132 B.R. 771, 773 (Bankr.N.D.Okla.1991).

In Idaho, creation of a security interest in a motor vehicle is governed by the Idaho Uniform Commercial Code, but perfection of that security interest is exclusively controlled by the terms of the Idaho Motor Vehicle Title Act. Idaho Code § 28–9–302(3)(b), (4); Idaho Code § 49–512; *Simplot v. Owens*, 119 Idaho 243, 805 P.2d 449 (Ct.App.1990). Until recently, when the relevant statutes were amended by the Idaho Legislature, the law provided that a security interest in an automobile was perfected as of the date the required title documents were submitted to the Idaho Department of Motor Vehicles, or its statutory agents, the counties.[6] The perfection or "recording date" was shown on the

---

6. **I.C. 49–205. Duties of Local Officers.**

(1) The assessors of the various counties of the state shall be agents of the department and shall perform duties prescribed in this Title.

(2) The county assessors shall receive and file in their respective offices all instruments required by chapter 5 of this title to be filed

with the county assessors, and shall maintain in their respective offices indices for certificates of title issued by the department which shall be kept alphabetically by the name of the owner.

.     .     .     .     .

certificate of title, and therefore, it was a matter of simple calculation to determine whether that date fell within either of the grace periods established by Sections 547(e)(2) or (c)(3) of the Code. As a result, bankruptcy trustees were frequently able to avoid security interests in vehicles where the requisite documentation *did not reach the proper government agency* within the relevant ten day period. *See, e.g., In re Blackman,* 92 I.B.C.R. 209; *In re Zabriskie,* 91 I.B.C.R. 176.

In 1992, the Idaho Legislature was persuaded to amend the state statutes to "make existing law compatible with the Federal Bankruptcy Code." *See* Final Legislative Bulletin, Idaho Courts Newsletter, April 22, 1992, p. 4; 1992 Idaho Session Laws, Chapter 143, effective July 1, 1992. "This legislation was sponsored by the Idaho [Automobile] Dealers Association in an effort to protect dealers and lenders from current bankruptcy problems." Stipulated Facts, Exhibit No. 7. The result was a new version of Idaho Code § 49–510 (a copy of which is attached to this Memorandum as an appendix for the convenience of the reader).

■ Under the revised statute, a more elaborate scheme is established to determine the date of perfection of a security interest. In summary, the amended Idaho statute requires filing of an application for title and related documents with the State. Under this system, perfection of a security interest is deemed to have occurred on the date the security interest was created, *if* the filing process is completed within thirty days of creation. Otherwise, a security interest is perfected as of the date of the filing of the documents with the agency.

In addition, if the documents as originally filed with the State or county are "incomplete or missing", they will be returned to the creditor. If the creditor then resubmits completed documents within twenty days thereafter, "the creditor will retain the original date and hour of receipt of the original filing". Idaho Code § 49–510(1).

Therefore, the new statute designates three possible dates upon which a given creditor's security interest will be deemed perfected: (1) the date the security interest is created, but only if the document filing process is completed within thirty days of the creation date; or (2) the date of the original filing of the documents with the State if the filing is not completed within thirty days of creation of the security interest, but that is completed within twenty days of the return to the creditor of any incomplete documents; or (3) in all other cases, the date of filing of the last of the documents to complete the filing.[7]

It is the interplay between Idaho's amended motor vehicle certificate statute and the Bankruptcy Code which gives rise to the issues before the Court. As the record shows, the Legislature's desire to make the state statute "compatible" with bankruptcy law was actually an attempt to shield motor vehicle dealers and lenders from preference avoidance. Defendant now carries that banner into this action.

## ARGUMENTS OF THE PARTIES.

Defendant contends that it properly complied with the amended Idaho Code § 49–510 in that within thirty days of the date of the creation of its security interest in Debtors' vehicle it completed filing with Bannock County of all documents necessary to transfer title and perfect its security interest. Because of this, the argument continues, Defendant asserts its security interest should be deemed to have been perfected on July 3, 1992. Because under the state statute its perfection date is deemed to "relate back" to the date the Contract was entered, Defendant reasons that its security interest could have defeated a competing judicial lien as of that date, and therefore, it demands the benefit of the ten day grace period afforded by both Section 547(e)(2)(A) and Section 547(c)(3). Defendant therefore argues its security interest is either not a preference, or alternatively, is excepted from avoidance.

Plaintiff disputes Defendant's position from several standpoints. He first argues

7. Simplification of the perfection system was apparently not a goal of the Legislature in enacting the amended statute. The perfection process under the revised law seems replete with potential state law legal and factual issues in no way related to any bankruptcy considerations.

that Defendant did not comply with the requirements of Section 49–510 of the Idaho Code and as a result the bank is not entitled to a perfection date that relates back under state law. In addition, Plaintiff notes, regardless of what other facts are shown, that the Certificate of Title actually issued by the State shows that Defendant's security interest was recorded on July 17, 1992. Plaintiff contends that date is therefore Defendant's perfection date under state law.

Alternatively, Plaintiff argues that even if Defendant was entitled to relation back under Idaho law, Sections 547(e)(2) and Section 547(c)(3) of the Bankruptcy Code only allow a ten day grace period for perfection. Plaintiff contends the term "perfected" in the bankruptcy laws refers to the creditor's act of perfecting the security interest. Because Defendant took the last act to perfect its security interest on July 17, 1992, and because the Contract was effective between the parties and Debtors received possession of the vehicle on July 3, 1992, an avoidable preference is therefore present here.

These arguments present the Court with difficult issues of law. The legal authorities cited by the parties are divided. However, after considerable research and deliberation, the Court concludes Plaintiff's position is the correct one, as is explained below.

## DISPOSITION OF THE ISSUES.

### A. *The State Law Applied to These Facts.*

The Court concludes that under applicable state law Defendant's security interest could not be deemed to have been perfected until, at the earliest, July 17, 1992. Even assuming Defendant's security interest could have related back to July 3 under the amended state statutes, it did not in this case for several reasons.

As a starting point for the analysis under state law of when a security interest is perfected, the Idaho Uniform Commercial Code explains:

"A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in Sections 28–9–302, 28–9–304, 28–9–305 and 28–9–306. If such steps are taken before a security interest attaches, it is perfected at the time when it attaches."

Idaho Code § 28–9–303(1). As noted above, it is Idaho Code § 28–9–302(3)(b) and (4) which require that perfection of a security interest in a motor vehicle be accomplished by the filing/notation requirements of Idaho Code § 49–510(1). Or, in other words, a security interest is perfected only when a secured party has completed "all the applicable steps" required by Idaho Code § 49–510(1).

It would therefore seem from a simple reading of the relevant state statutes that the earliest date Defendant's security interest could be said to have been perfected was July 17, 1992, when it completed all the filing requirements of Idaho Code § 49–510(1).

Moreover, while the complicated system established under Idaho Code § 49–510 for determining when a security interest is perfected arguably protects Defendant, this contention overlooks other language in the same statute. Under the statutory procedure, it is actually the State, not the Defendant or this Court, that fixes the perfection date. This conclusion is premised upon the last paragraph of Idaho Code § 49–510(1) most of which substantially predates the recent amendments. It states that:

. . . .

When the department is satisfied as to the genuineness and regularity of the documents submitted, it shall issue a new certificate of title which shall contain the name of the owner of the vehicle, the name and address of each holder of a lien or encumbrance, and a statement of all liens or encumbrances which have been filed with the department, together with the date of each lien or encumbrance and the date and hour received by the department or agent of the department. *The filing of a lien or encumbrance and the notation of it shall be a condition of perfection* and shall constitute constructive notice of the lien or encumbrance and its contents to creditors and subsequent purchasers and encumbrances. *All liens or encumbrances so filed with the department shall be perfected and take priority according to the*

*order of time in which the same are noted upon the certificate of title....*

Idaho Code § 49–510(1) (emphasis added).

According to the language of the statute quoted above, not only must a lienholder *file* the proper paperwork with the agency to have its security interest deemed perfected under state law, but the notation of that security interest on the actual title certificate is another distinct "condition of perfection." Additionally, under the statute, a security interest is deemed perfected according to the date noted by the State on the title certificate.

In this case, the State noted the date "July 17, 1992" as the recording date of Defendant's security interest. Defendant urges the Court to ignore this point, because, it asserts, it was obviously entitled to have an earlier date (i.e. the lien creation date) noted as its perfection date. However, the prior decisions of this Court decry such an approach. In interpreting the same statutory provision in a 1982 decision, Judge Young astutely observed that:

> It is impractical for this court to try to determine the date upon which the assessor's office or the Department of Law Enforcement receives and processes applications for perfection of liens. The Assessors and the Department of Motor Vehicles have the affirmative duty to receive and record such documents. If errors are made by those agencies, the bank must look to them to correct their errors and deficiencies.

*In re Franke*, 82 I.B.C.R. 201, 202. In *Franke*, the Court held that the date noted on the title certificate was the date of perfection of creditor's security interest, in spite of the creditor's presentation of evidence that the documents had actually reached the agency earlier.

■ The Court here adopts the same analysis, and concludes that under the statutes, as well as a matter of administrative practicality, the date on the title certificate constitutes the lender's perfection date. Com-

mercial reality demands that parties be able to rely upon the lien perfection information contained in the title certificate, just as they would rely upon the other facts shown on the title. Great uncertainty would be injected into credit and other transactions involving motor vehicles if parties were allowed to impeach or contradict the lien recording information on title certificates with non-record facts. The statute reflects this policy by dictating that liens are deemed perfected according to the time noted on the certificate.

■ Alternatively, this Court cannot agree with the basic premise of Defendant's argument that the earlier date was the correct one for notation on the title. A review of the documents filed with Bannock County reveals that at no time did Defendant or Ted's actually supply the lien creation date information in the title application documents. The written instructions provided to Defendant, Ted's and other dealers and financiers by the State prior to the effective date of the amended statute, conspicuously advises dealers and lenders that in order to have the date of lien creation noted on a title they must "CLEARLY LIST THE TIME AND DATE OF THE LIEN CREATION ON THE TITLE APPLICATION." *See* Stipulated Facts, Exhibit No. 7. The memorandum from the State also warns, quite properly, that the responsibility for correctly reporting the time and date of the lien creation and otherwise proving compliance with the new statute falls on the secured party. *Id.* The State's letter also provides sample forms for use in such transactions.

In other words, the creditor must provide the lien creation date on the title certificate application in order for the State to perform its duty of noting such as the recording date on the title certificate. In this case, the agency was unable to assign any other perfection date than July 17, 1992 to Defendant's security interest because no other date had been provided.[8] Failure to note this crucial information in its title application documents is just as fatal to the proper perfec-

---

8. The instruction memo makes it clear that the lien creation date must appear on the application for title, since under the revised procedure the State is not supplied with a copy of the security agreement. Even were the contract supplied, it is doubtful that the State has an independent duty to glean the proper perfection date from such other documents.

tion of Defendant's lien as would be neglecting to supply the name of the lienholder. Any loss occasioned by such an omission in this case must be borne by the Defendant.

In summary, under the state statutes, a security interest is perfected only when the act of filing the necessary documents with the State is completed. In addition, the Court should determine the perfection date of motor vehicle security interests based upon the date and time actually noted by the State on the title certificate. While Defendant disagrees, the date actually noted on the certificate here appears to the Court to be the proper one since Defendant's assignor, Ted's, failed to provide the lien creation date to the State.

If July 17, 1992 is used as Defendant's perfection date, because that date is more than ten days after the Contract was effective between the parties and the Debtors took possession of the car, Defendant's security interest is deemed transferred on that date, and is therefore an avoidable preference.

## B. *The Federal Bankruptcy Law Issues.*

■ Assuming the Court were to accept Defendant's position that under state law its security interest was deemed perfected as of the date of the execution of the Contract by the parties, Defendant then concludes that its security interest may not be avoided as a preference under Section 547 of the Bankruptcy Code. In essence, Defendant equates this alleged "perfection" date with the "transfer" date for preference purposes. As such, Defendant asserts that under Section 547(e) the transfer occurred at the same time as the debt was incurred, and therefore there was no transfer on account of an antecedent debt. In addition, it suggests the transfer would be protected by Section 547(c)(3), the enabling loan exception to avoidance.

As will be seen, there is support in the case law that state law grace periods control the outcome of this case. There is also substantial contrary authority. After review of these authorities, though, the Court concludes that Defendant's position, and the cases that support it, are incorrect.

### 1. *No Supremacy Clause Issue is Presented.*

[9] This Court's analysis of the bankruptcy law questions begins by determining the nature of the issue presented in this action. Plaintiff characterizes the issue as one turning on the supremacy of federal law when it comes into conflict with inconsistent provisions of applicable state law. The Court disagrees.

Section 547(c)(3) and Section 547(e) are provisions applicable only in the context of a federal bankruptcy proceeding in general, and more particularly, only with respect to whether an avoidable preference has occurred. As such, these statutes serve a purpose separate and distinct from the perfection rules under state law for security interests in motor vehicles.

By the same token, there is no comparable cause of action under Idaho state law for setting aside otherwise valid transfers by a debtor which prefer one creditor over another. State law cannot determine whether there is a preference for federal bankruptcy purposes unless Congress provides such, which in this instance it has not. In other words, there has been no attempt by Congress and the State here to determine rules of law with respect to the same subject matter, and consequently, no supremacy clause issue is presented.

### 2. *Interpreting the Ambiguous Bankruptcy Code Provisions.*

■ Rather, the issue presented is one of interpretation of the provisions of Section 547. Narrowing the focus further, the Court is asked to construe the meaning of the language of Sections 547(c)(3) and 547(e)(2) wherein Congress measures rights of a creditor based on the time its security interest is "perfected."

In approaching interpretive issues, the Court is cognizant of recent Supreme Court instructions that the Bankruptcy Code is to be given its "plain meaning", *Patterson v. Shumate,* — U.S. ——, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) (*citing Toibb v. Radloff,* 501 U.S. 157, ——, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991)), and

that the Court should not consult outside sources, such as legislative history, in construing the statute unless the statute is ambiguous. *Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992); *Toibb v. Radloff,* 501 U.S. at ——, 111 S.Ct. at 2200. Outside assistance in construing the statutes is mandated in this case, however, because the term "perfected" is subject to at least two different meanings as used in Section 547 in this context.

Plaintiff argues that when Congress speaks of a transfer being "perfected" in the preference law, it is referring to an act taken by the transferee (i.e. the creditor "perfected" the security interest). Defendant, however, explains that this language is more properly construed as a reference to the status of the transferee's interest in the subject property (i.e. the creditor's security interest is "perfected"). Both interpretations are plausible, and the use of the term in the statutes creates an ambiguity. The Court can therefore properly access sources other than the Code itself to determine the meaning of the provisions in question.

### 3. *The History of the Preference Grace Periods.*

So what did Congress intend? One source for clues to unravel the puzzle is the history of the Section 547 provisions. Fortunately for the Court the task of researching that history has already been competently undertaken by another bankruptcy court.

When presented with a similar issue in *In re Burnette,* 14 B.R. 795 (Bankr.E.D.Tenn. 1981), Judge Ralph E. Kelley, a distinguished bankruptcy judge with decades of experience, undertook a comprehensive examination of the history of Sections 547(e)(1) and (c)(3). The Court traces the statutory language back through the years, through commissions and committees, courts and Congress. While the reader is best referred to the text of the Court's decision for a complete analysis, Judge Kelley's conclusions are summarized in the decision:

"It is evident that Congress did not intend for state grace periods to be relevant under the preference statute. There was to be a uniform rule throughout the nation. In any jurisdiction, a transferee was to have only ten days to perfect a transfer and thereby avoid the antecedent debt problem. Ten days was picked apparently because it corresponded to state law, but Congress did not specifically refer to grace periods under state law."

14 B.R. at 801.[9]

The Court also makes another observation concerning the history of the language of the preference provisions that is significant here. The Court carefully outlines the fact that a federal grace period for perfection of transfers had been a feature of the Bankruptcy Act prior to the enactment of the 1978 Code. 14 B.R. at 798. The Court noted that Section 60(a)(7) of the Act allowed a party to perfect a transfer within such period allowed by applicable state law, provided that period of time could not exceed twenty-one days. *Id.* Clearly, then, under prior law Congress intended the twenty-one day period as a maximum, not a minimum, limitation on a party's ability to take advantage of state relation-back statutes. Judge Kelley concludes that it was Congress' intent to incorporate the same approach in the new Section 547 of the Code. *Id.*

The *Burnette* court's observations concerning the language and operation of the Bankruptcy Act are significant because of the teachings of the U.S. Supreme Court in *Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). In that decision, the Supreme Court determines that absent an indication to the contrary in the language or history of the 1978 Bankruptcy Code, the courts are to assume that accepted established practices under pre-Code law (i.e. the Act) have continued vitality, and supplement the provisions of the Code. *Id.* —— U.S. at ——, 112 S.Ct. at 779.

It appears that under the Bankruptcy Act creditors had a fixed period of not to exceed

---

**9.** Judge Kelley goes on to adopt the interpretation urged by Defendant, herein, in spite of his findings as to Congressional intent because he finds that construction to be more "reasonable".

14 B.R. at 801. This Court's disagreement with the Court's ultimate conclusion is discussed later in this opinion.

twenty-one days to perfect a security interest, unless a shorter period was prescribed by applicable state law. Under *Dewsnup*, then, the pre-Code law that specified a uniform maximum grace period for perfection of liens in order to escape preference avoidance is presumptively still a part of the Code unless there is some express indication by Congress that a change was intended. This Court can discover no such contrary intention.

Therefore, there are at least two reasons that Sections 547(e) and 547(c)(3) should be interpreted creating a single, uniform grace period: (a) the history of the enactment of these provisions supports this view; and (b) a *Dewsnup* type analysis requires this feature of pre-Code law to continue since no clear contrary intent is found in the 1978 law.

### 4. *Cases Supporting a Uniform Grace Period.*

Other courts that have examined this issue have also concluded that the trustee's position, and not that urged by the bank, is correct.[10] A sampling of their reasoning is instructive.

In one district, two sitting bankruptcy judges reached opposite conclusions on this issue when it was presented to them.[11] Responding to his colleague's conclusion that state relation back periods are applicable in a preference action,[12] Judge Wilson concludes:

"Of course, in the real world perfection is actually accomplished on a particular date by doing a particular act. The "relation back" theory would have perfection exist before it occurred. Such an unreal result should only occur on clear and precise

**10.** *In re Hamilton*, 892 F.2d 1230 (5th Cir.1990); *In re Holloway*, 132 B.R. 771 (Bankr.N.D.Okl. 1991); *In re Holder*, 94 B.R. 395 (Bankr. M.D.N.C.1988); *In re Scoviac*, 74 B.R. 635 (Bankr.N.D.Fla.1987); *In re Murray*, 27 B.R. 445 (Bankr.M.D.Tenn.1984).

**11.** *See* Judge Wilson's opinion in *In re Holloway*, 132 B.R. 771 (Bankr.N.D.Okla.1991). His colleague, Judge Covey, suggested a different result in *In re Power*, 133 B.R. 242 (Bankr.N.D.Okla. 1991). Judge Wilson responded with a supplemental opinion, *In re Holloway*, 132 B.R. at 773.

**12.** Judge Covey opined that:

direction by statutory language or on convincing demonstration of legislative intent.

In this Court's view, the natural reading of Section 547(e)(1)(B) is that perfection occurs when the last act required by State law to acquire the desired status is performed. The contrary interpretation that Section 547(e)(1)(B) refers not to the real-world doing of an act but to a fictional period of time is an ingenious, but strained and unnatural, reading of the statute."

*In re Holloway*, 132 B.R. at 774.

The Court in *In re Holder*, 94 B.R. 395 (Bankr.M.D.N.C.1988) stresses in its analysis that while the preference statute refers readers to state law to determine the date of perfection of a security interest, that the date of the transfer for preference purposes involves an issue of federal, not state, law. *Id.* at 398. As the Court notes:

"A creditor can perfect its interest in collateral creating a lien thereon by filing at any time, and that will be good as to other subsequent lienholders in a state court proceeding. However, if the lien is not perfected within the 10-day window allowed by section 547(e)(2) and that creditor finds itself entangled in a bankruptcy proceeding in a federal Bankruptcy Court, that lien is avoidable by the Trustee in bankruptcy as a preference."

*Id.*

As noted above, there are other decisions that echo the reasoning of these Courts.

### 5. *Other Authorities Favor a Uniform Grace Period.*

Respected secondary authorities on bankruptcy and commercial law have also examined this issue and concluded that the Plain-

"Under Oklahoma law, the lien of GMAC was deemed perfected on Day One even though the physical act of perfection occurred on Day 15. The Bankruptcy Code does not say the physical act of perfection has to occur within ten days; it just states that the lien must be perfected within ten days."

133 B.R. at 244. Of course, the Court is correct in observing that the Code does not expressly dictate an answer to this issue. Were that otherwise, there would be little need for his, or this Court's, decision.

tiff's position is correct. For example, Professors White and Summers, in their hornbook on the Uniform Commercial Code, comment extensively on the Section 547(e) issue. After reviewing the basic interpretive issue, they state:

> "Presumably the 10 day grace period in [Section] 547(e) was chosen to correspond with the 10 day grace period in UCC 9–301 and 9–312. Under 9–301(2) if a secured party files with respect to a purchase money security interest within 10 days after the debtor receives possession of the collateral, that secured party takes priority over an intervening lien creditor. That result is now consistent with the [Section] 547(e) rule. In certain cases creditors have found it difficult to get an effective recording within 10 days of the security agreement. That might be the case, for example, if one needed to get his named listed on a certificate of title but there was a paperwork backlog at the Secretary of State's office or the creditor's procedures themselves were slow. In response to those creditors' complaints several states have changed the 10 day rule in 9–301 to a 20 day rule.
>
> Does the 20 days incorporated in 9–301 govern [Section] 547(e) as well? One court has said that the 20 days does apply to [Section] 547(e) but others have rejected that argument and have concluded Congress intended the 10 day time in (e)(2) to be a federal rule and, in effect, to provide a rule of law that one perfecting after that time would be deemed to have made his transfer then and not to enjoy the relation back. At least two technical arguments can be made on behalf of a secured creditor perfecting beyond 10 days, but short of 20 days in one of the states that permits such relation back. First, one can argue that the transfer is excepted from [Section] 547 by [Section] 547(c)(1) as substantially contemporaneous. In the face of the rigid [Section] 547(e) 10 day rule most courts have rejected that argument and have concluded that Congress could not have in-

tended an open-ended invitation to creditors to mend their fences by reference to (c)(1).[13]

> Equally unpromising but more clever is the argument that in such a state the transfer in fact is perfected on the date the security agreement is signed as long as there is a financing statement filed within 20 days. One reaches this conclusion by looking first to [Section] 547(e)(1)(B) which states something is "perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interests of the transferee." One then argues in such a state that there is never a time after the security agreement was granted when a lien creditor would have defeated the secured creditor because under the state law there was a 20 day relation back. *The trouble with this argument is that [Section] 547(e)(2) refers explicitly "to the time the transfer takes effect between the transferor and transferee (i.e., the time of the signing of the security agreement) and the time such transfer "is perfected". Obviously [Section] 547(e)(2) is referring to two different times. The later is intended to be the time when the UCC–1 is filed, not the time of the signing of the security agreement. Thus, in the prior Section 547(e)(1), the reference to the time when the creditor "is perfected" does not mean the time the security agreement is signed even in the setting in which there would be a relation back to that time. If all of that is not clear, read it again together with the statutes and we hope it will become clear."*

White and Summers, Uniform Commercial Code § 25–7, 447–48 (3d ed. 1988). (emphasis added).

Collier on Bankruptcy makes a similar observation concerning the Section 547(c)(3) enabling loan grace period. The exception originally enacted in the 1978 Code provided that the grace period for perfection of security interests in enabling loan transactions would run for ten days from the date the

---

**13.** The Ninth Circuit Court of Appeals, in a case originating in this district, has held that a secured creditor cannot take advantage of the Section 547(c)(1) contemporaneous exchange excep-

tion to preference avoidance in cases to which Section 547(c)(3) would apply, i.e. purchase money security interests. *Valley Bank v. Vance,* 721 F.2d 259, 262 (9th Cir.1983).

security interest "attached". That language was changed by Congress in 1984, (Section 462; Bankruptcy Amendments and Federal Judgeship Act of 1984; Public L. No. 98–353) and the time for perfection now runs from the date the debtor receives "possession" of the property. Referring to several bankruptcy court decisions reaching conflicting results under the earlier version of Section 547(c)(3), Collier explains the reason for the change as follows:

> By establishing a uniform, measurable date to trigger the running of the 10–day period under section 547(c)(3), Congress has eliminated the possibility of inconsistent decisions based upon the vagaries of state law.

4 L. King, Collier on Bankruptcy ¶ 547.11, p. 547–54, n. 2. Of course, if the Court were to accept Defendant's arguments concerning the interpretation of Section 547(c)(3), it would mark a return to potentially "inconsistent decisions based upon the vagaries of state law". To implement the policy behind the amendment to Section 547(c)(3), the Court must apply a uniform ten day rule, and not the peculiar mechanics of Idaho Code § 49–510.

### 6. A Uniform Grace Period Operates Logically in Connection with Other Bankruptcy Code Provisions.

There is other evidence in the Code that Congress intended the Section 547(e)(2) ten day grace period to be just that: ten days. For example, Section 362(b)(3) excepts from the operation of the automatic stay any post-petition "act to perfect an interest in property ... to the extent that such act is accomplished within the period provided under Section 547(e)(2)(A)." Additional uncertainty is introduced under Section 362(b)(3) of the Code if instead of a fixed ten day period, applicable state law grace periods are incorporated into Section 547(e)(2).

It should be remembered that Congress gave special preference protections to the holders of purchase money security interests under Section 547(c)(3). Under Defendant's logic, however, even more avoidance protection is presented. Not only will different preference rules apply to similarly situated creditors in different states under Defendant's approach, but in states such as Idaho, different rules would apply within the same state depending upon the nature of the collateral involved.

Recall, the holder of a security interest in a motor vehicle under Idaho law has effectively thirty days to perfect that lien from the date the security interest is created. This statute applies to purchase money and non-purchase money security interests alike. By contrast, Idaho Code § 28–9–301(2) establishes a 21 day relation back perfection period for creditors holding purchase money security interests in property covered by the Uniform Commercial Code. No grace period is provided for non-purchase money security interests.

If Defendant is correct, and state law controls, an odd set of preference rules arise. For example, the holder of a non-purchase money security interest in an automobile is allowed thirty days to perfect, while the holder of a purchase money security interest in other types of goods has only 21 days to perfect in order to escape preference avoidance. In effect, it is the states, not Congress, that determines the relative rights of different types of secured creditors under Defendant's approach. This system lacks any logical basis.

Plaintiff presents a more consistent system. Interpreting Section 547(e) and (c)(3) uniformly for preference purposes, all creditors, regardless of the kind of security they hold, have ten days from the effective date of the transaction to perfect their security interests. Additionally, all holders of purchase money security interests have ten days from the date the debtor receives possession of the collateral to perfect.[14] Congressional desires are respected under this approach.

Moreover, Congress did not ignore the operation of state relation back perfection

---

14. Presumably Congress, not the states, should properly dictate the relative rights of creditors in bankruptcy cases. In addition to the preference rules, other examples of Congressional recognition of differing creditor rights in bankruptcy include establishing distribution priorities under Section 507 and exceptions to discharge under Section 523.

statutes in the Code. This is apparent from a reading of Section 546, entitled "Limitations on Avoiding Powers", which provides in part that:

> The rights and powers of a trustee under sections 544, 545, or 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.

11 U.S.C. § 546(b). Where Congress intended transferees to have avoidance protection under state relation back statutes, it specified such in Section 546(b).[15] It expressed no such protection for actions commenced under Section 547. For instance, under Section 546(b), a creditor has the protections of state relation back statutes against attack by a trustee under the strong-arm provisions of Section 544(a), or the statutory lien avoidance provisions of Section 545 of the Code. If Congress intended Defendant here to have a similar defense to a Section 547 preference action, why did it mysteriously omit such reference in Section 546(b)? The Court is not inclined to grant Defendant the same rights judicially that Congress declined to enact legislatively.

7. *Cases Determining that State Law Grace Periods Apply are Based Upon Inappropriate Policy Considerations.*

What is the reasoning of the courts that conclude that state relation back perfection statutes should control in preference cases? The basis for this conclusion is, regrettably, founded more on policy than on principles of statutory interpretation.

For example, as noted above, Judge Kelley in *Burnette* decides that creditors should have the benefit of state relation back laws in preference actions. He does so because, according to his opinion,

> "[T]his interpretation is the more reasonable of the two. Though both interpretations are consistent with the wording of

the definition [of "perfection"] this one is less troublesome than the interpretation that agrees with Congress's intent. That interpretation strains the wording of the definition to conclude that the court must consider the facts from an earlier perspective, rather than as they turned out."

*In re Burnette,* 14 B.R. at 801.

This portion of the *Burnette* decision is quite perplexing. Having established that the Code provisions are ambiguous and subject to at least two interpretations, and then having concluded that only one construction of the statutes comports with Congressional intent, what possible justification can there be for the Court to choose among the different interpretations based upon "reasonableness"?

With the greatest deference to Judge Kelley, this Court must disagree with his approach. It is not the federal courts but rather Congress that properly selects the most appropriate public policies for incorporation into the law. Congress, not the courts, weighed the competing concerns of providing a uniform federal grace period versus reliance on the various state created grace periods for perfection of security interests under the bankruptcy laws. In this setting, once the Court has determined Congressional intent, it is error to ignore it in favor of a "better reasoned" approach. *See In re Holloway,* 132 B.R. at 775. The comments of the Court in *Burnette* would be persuasive if they were found in the legislative history to Section 547. This reasoning is not a proper basis for deciding legal issues involving statutory construction.

The holding in *Burnette* has other support. Two circuit courts have also concluded that Defendant should prevail here. In *In re Busenlehner,* 918 F.2d 928 (11th Cir.1990), the Court, without reference to any possible ambiguity in the Code, decides that a state law relation back statute, in that case a Georgia law, should apply in a preference action.

---

**15.** "The trustee's rights and powers *under certain avoiding powers* are limited by Section 546.... The purpose of the subsection is to protect, in spite of the surprise intervention of a bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection." H.R.Rep. No. 595, 95th Cong., 1st Sess. 371 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 86 (1978) 1978 U.S.Code Cong. & Admin.News 5787, 6327, 5872 (emphasis added).

Again, the *Busenlehner* Court approaches the task of discovering relevant Congressional intent, not from a historical basis, but rather from the hindsight of the Court's own view of the more appropriate policy:

"[The Court's] conclusion is supported by the policies underlying preference law. The goal of the drafters of this provision of the 1978 Bankruptcy Reform Act was to bring preference law "more into conformity with commercial practices and the Uniform Commercial Law." S.Rep. No. 989, 95th Cong., 2d Sess. 87 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5873. Creditors are encouraged by our legal system to secure their loans. The general message to creditors is that should they follow state commercial law their secured loans will be protected in bankruptcy.

By limiting the effect of state relation-back statutes in bankruptcy, legitimate commercial practices are penalized. To hold for the Trustee in this case may be beneficial in that it creates a larger estate to pay administrative expenses and unsecured claims. But this benefit is outweighed in that the original enabling loan increased the size of the estate. The creditor, moreover, lent the money in the expectation that the creditor's compliance with state law was sufficient to protect the loan. Debtors should not be given the ability to surprise and upset established commercial practices by filing for bankruptcy and avoiding this otherwise acceptable security interest."

*Id.* at 931. Even assuming it is proper for the Court to decide this case based upon its assessment of the competing benefits of vari-

able state law grace periods compared to a uniform federal time limit, there are flaws in the Court's analysis.

First of all, the *Busenlehner* Court's quotation of legislative history indicating Congress' intent to modernize preference law, and to bring it into conformity with prevailing commercial practices is certainly correct, but those comments are directed at the preference statute in general, not the specific subsections of Section 547 here in issue. The Court also misconstrues the reference in the legislative history to the reason why Congress selected a ten day period of time to allow a creditor to perfect a purchase money security interest (i.e. to conform with the law in most states) as an alleged basis for the wholesale incorporation of state law into the Code.

Preference law is inherently incompatible with many aspects of the Uniform Commercial Code. Certainly Congress, in the selection of a uniform ten day grace period, could properly consider the existence of similar provisions in the states under the UCC. There is no indication, however, that Congress intended that a potentially different grace period be available in each state in which a bankruptcy proceeding was filed. Uniformity of the bankruptcy laws is clearly at least as important a policy consideration, if not more so, than deference to state law grace periods.[16]

Next, as with *Burnette*, the *Busenlehner* Court engages in unfortunate judicial activism when it concludes that it is more beneficial to protect creditors claiming to be secured over unsecured claimants in bankrupt-

---

**16.** Other general comments from legislative history cast the *Busenlehner* decision in a different light. In the House Report, for example, the following is found, referring to the preference provisions of the new Code:

It is time to bring the two statutes [referring to the UCC and the bankruptcy laws] into harmony, and H.R. 8200 does that by adopting the more modern terminology of the Uniform Commercial Code, and providing for specific treatment of transfers governed by the Code.... the language of the current preference section is hopelessly complex and has been subject to varying interpretations. The

bill undoes the numerous amendments that have been heaped on section 60 [of the Bankruptcy Act] during the past 40 years, and proposes a unified and coherent section to deal with the problems created by prebankruptcy preferential transfers.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess., 179 (1977) 1978 U.S.Code Cong. & Admin.News 6140–6141. While conformity with state law is one goal of the new Code, as can be seen, so also was a "unified and coherent" approach to preference law which avoids complexity and varying interpretations of the law.

cy proceedings. That determination simply does not lie within the province of the court in this setting.[17]

Further, the notion that the Code gives a trustee the right to "upset established commercial practices" by avoiding an "otherwise acceptable security interest" is an indictment not limited to the ten day grace period of Sections 547(c)(3) or 547(e) since this same observation could be made as to any preference. Nearly all transfers avoided under Section 547 are otherwise valid and lawful under state law. Validity under state law is not the litmus test of avoidability as a preference in bankruptcy. That Congress perceived a sufficient basis existed to allow avoidance of such transfers is a proper exercise of its legislative discretion in such matters.

■ In addition, the case before the Court here demonstrates the weakness of the argument that by using a uniform ten day grace period, accepted commercial practices are somehow impaired. As noted above, the 1992 amendment to Idaho Code § 49–510, sponsored by lenders and dealers, was not enacted by the Legislature to deal with any problem with state law or practices. Prior to the statutory amendment, there was no grace period in state law, nor relation back of rights, and therefore, no "established commercial practice." Rather, the new perfection system was adopted *solely* as a means of defending its beneficiaries against avoidance of their security interests in federal bankruptcy proceedings.

In theory, at least, if Defendant's argument is adopted, state legislatures can simply enact longer and longer grace periods until avoidance of security interests as preferences becomes unlikely, if not impossible. It is not likely that Congress sought to delegate the power to define a preference to the various states.[18] Instead, adoption of state perfection periods would "wreak havoc on the stability engendered by Section 547(e)(2)(B) of the Bankruptcy Code." *In re Scoviac*, 74 B.R. 635, 638 (Bankr.N.D.Fla.1987).

■ Likewise, there can be little "surprise" to the lender or dealer who fails to perfect its lien within ten days as required by Sections 547(e) or (c)(3). The Bankruptcy Code has been the law of the land since 1978, and the federal bankruptcy laws are presumed to be a part of every contract, the parties being charged with notice of the contents of the law. *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490 (1938).

Similarly, every creditor that extends credit presumptively expects to be repaid. There is no legitimate basis to suspend operation of the Code simply because it potentially frustrates the creditor's repayment expectations. *Busenlehner's* logic is not convincing. *See In re Holloway*, 132 B.R. at 774.

The other circuit case, *In re Hesser*, 984 F.2d 345 (10th Cir.1993), and other lower

---

17. This sort of assault on bankruptcy preference law has been criticized by scholars:

"[T]he instability of preference legislation lies with judges who deny that precise legislative rules are ever sensitive enough to capture the nuances of commercial behavior and the norms of the marketplace. The one dominant historical ritual in twentieth century American preference law has been for Congress to enact a new and supposedly clear and broad preference rule, and for judges then to ignore or shamelessly manipulate statutory rules to preserve transactions against a preference attack. In short, judges transform rigid statutory rules into flexible discretionary norms, and turn preference law into a matter of ' "I know it when I see it." ' Judges do so when they test the transaction against their sense of market norms, and uphold the transaction because,

whatever the statutory rule, they find no subversive collusion between debtor and favored creditor."
Weisberg, Commercial Morality, the Merchant Character, and the History of the Voidable Preference, 39 Stan.L.Rev. 3, 11 (1986).

18. Interestingly, Senate Bill No. 540, a comprehensive set of amendments to the Bankruptcy Code is currently under consideration in Congress. One such change proposed by the bill would be to extend the Section 547(c)(3) grace period to 20 days from the present 10 days because most states have now adopted longer periods for perfection of purchase money security interests. If Defendant's position is correct, and state relation back statutes are already operative under the statute, it is curious that some in Congress feel the need for an amendment to the Code. S.Rep. No. 103–168, 103d Cong. (1993).

court opinions,[19] adopt without any new analysis the conclusions of *Busenlehner*, and therefore suffer from the same infirmities. No additional persuasive arguments are raised in any of the other authorities upon which Defendant relies.

In summary, then, the Court disagrees with Defendant's argument that under Sections 547(e) and 547(c)(3) the perfection grace period of Idaho Code § 49–510 is incorporated, and its security interest is insulated from preference avoidance. While the preference provisions are ambiguous, a review of the legislative and other history reveals that Congress intended that creditors be allowed a uniform ten day grace period within which to perfect security interests. This interpretation is in harmony with the operation of other relevant provisions of the Code. The interpretation is also supported by the better reasoned case law, and by other respected secondary authorities on the subject. Those cases which support Defendant's position ignore legislative intent and engage in inappropriate policy judgments about the operation of the Code.

### 8. *Defendant's Other Arguments.*

Defendant makes one other argument worthy of comment by the Court, although it too is unavailing.

■ Defendant asserts that, pursuant to Idaho Code § 49–503,[20] in this state a party acquires no legally enforceable right, title or interest in a motor vehicle until such time as the State has issued a certificate of title showing that interest. Defendant then points out that under Section 547(e)(3) of the Bankruptcy Code, a transfer cannot occur for preference purposes "until the debtor has acquired rights in the property transferred." 11 U.S.C. § 547(e)(3). Therefore, according to Defendant, both the Defendant's and the Debtors' rights in the motor vehicle could not have arisen under state law until the vehicle title was actually issued [i.e. printed] by the State on July 23.[21] Because of this, Defendant reasons, there can be no transfer on account of an antecedent debt.

That arguably Debtors could not have conveyed the car to a third party until the title was issued misperceives the focus of the Section 547(e)(3). For bankruptcy purposes, clearly the Debtors "acquired rights" in the vehicle in this case as against the Defendant when the Contract was signed and they took possession of the vehicle. "Rights in the collateral" is another concept borrowed from the U.C.C. and the case law indicates the phrase encompasses almost any rights that a debtor may have including possession of the collateral, accompanied by a contingent right of ownership.[22]

■ Alternatively, Defendant fails to acknowledge that Idaho Code § 49–503 contains express exceptions to the operation of the rule upon which Defendant relies. One of those exceptions concerns transactions governed by Idaho Code § 49–502[23] which

---

**19.** *In re Loken*, 156 B.R. 660 (Bankr.D.Or.1993); *In re Power*, 133 B.R. 242 (Bankr.N.D.Okla. 1991).

**20.** 49–503. Issuance of certificate of title requisite to acquisition of title—Waiver or estoppel.— Except as provided in sections 49–502, 49–510 through 49–512, and 49–514, Idaho Code, no person acquiring a vehicle from the owner, whether the owner is a dealer or otherwise, shall acquire any right, title, claim or interest in or to the vehicle until he has issued to him a certificate of title to that vehicle, nor shall any waiver or estoppel operate in favor of that person against a person having possession of a certificate of title or an assignment of the certificate of the vehicle for a valuable consideration.

**21.** This argument is, of course, inconsistent with Defendant's contention that under Idaho Code § 49–510 its security interest was perfected against third parties as of the date it was created,

or at least as of the date it completed its filings with the State. It is also at odds with the holdings of this Court. *See In re Blackman*, 92 I.B.C.R. 209.

**22.** *See, e.g., Idaho Code § 28–9–203(1)(c); First Security Bank of Idaho v. Woolf*, 111 Idaho 680, 681, 726 P.2d 792, 729 (Ct.App.1986); *In re McFarland*, 112 B.R. 906, 910 (Bankr.E.D.Tenn. 1990); 2 White & Summers, Uniform Commercial Code § 24–6 at 322–23 (3d ed. 1988).

**23.** 49–502. Delivery of certificate of title upon sale or disposition—Reassignment by dealers.— No person shall sell or otherwise dispose of a vehicle without delivery to the purchaser or transferee a certificate of title with an assignment as necessary to show title in the purchaser, nor purchase or otherwise acquire or bring into the state a vehicle except for temporary use as provided by section 49–432, Idaho Code, unless

provides for the sale of vehicles by dealers without issuance of a new title to the dealer, through the dealer's reassignment of an existing certificate of title. That, of course, is exactly the situation before the Court here, since a Florida title certificate had previously been issued on the subject auto, which was assigned to the dealer by the original seller, and then reassigned by Ted's to Debtors as a part of the July transaction.

Another exception listed in Idaho Code § 49–503 refers to transactions governed by § 49–510, sale of vehicles under a contract granting the seller a security interest. This exception would also likely defeat Defendant's argument under these facts.

Therefore, Idaho Code § 49–503 is not applicable here and Defendant's arguments are misplaced.

**CONCLUSION.**

While Defendant shrewdly argues to the contrary, under these facts its security interest in the Debtors' vehicle is avoidable as a preference in bankruptcy. Defendant seeks protection under the new state statute governing perfection of security interests in vehicles, but it failed to comply with the procedures specified in that law. Even if it did comply, the relation back provisions contained in the state law do not operate to extend the grace period established by Congress as a part of the federal bankruptcy law.

Defendant, as well Idaho's other auto dealers and lenders, presumed that the state legislature could rescue them from the clutches of a federal bankruptcy trustee. Their efforts were misdirected. Instead of lobbying the state legislature with their cause, their comments should have been addressed to Congress. This Court respectfully declines Defendant's suggestion that it can ignore the intent of Congress and rule, as other courts unfortunately have been persuaded to do, that a more "reasonable" approach in this area is appropriate.

Accordingly, counsel for the Plaintiff may submit an appropriate form of judgment declaring that Defendant's security interest in

the subject vehicle, and the sale proceeds thereof, be deemed avoided pursuant to Section 547(b) of the Bankruptcy Code. This Memorandum constitutes the Court's findings of fact and conclusions of law. F.R.B.P. 7052.

APPENDIX

**49–510. Liens and encumbrances—Filing—Fee—Notation on certificate—Constructive notice.**—(1) No lien or encumbrance on any vehicle registered under the laws of this state created subsequent to December 31, 1986, irrespective of whether such registration was effected prior or subsequent to the creation of the lien or encumbrance, shall be perfected as against creditors or subsequent purchasers or encumbrancers without notice until the holder of the lien or encumbrance, or his successor or assignee, has complied with the requirements of section 49–504, Idaho Code, and has filed the properly completed title application and all required supporting documents with the department or an agent of the department.

When the holder of a lien or encumbrance, his successor or assignee, has filed with the department or agent of the department a properly completed title application and supporting documents as required by section 49–504, Idaho Code, it shall be the duty of the department or agent of the department to file the same, indorsing on the title application the date and hour of the creation of the lien or encumbrance. A lien is perfected as of the time of its creation if the transaction is notarized and if the filing is completed with the department or an agent of the department within thirty (30) calendar days thereafter; otherwise, as of the date of the filing with the department or an agent of the department. If the title application is incomplete or if the supporting documents are incomplete or missing, the title application and supporting documents as submitted will be returned to the lien holder or his successor or assignee for correction and, if the application is not resubmitted in a complete form, including completed supporting docu-

---

he shall obtain a certificate of title in his name in accordance with the provisions of this chapter. Any dealer holding current Idaho dealer license

plates may, in lieu of having a certificate of title issued in his name, reassign any existing certificate of title issued in this state.

502

ments, to the department or to the agent of the department within twenty (20) days of their having been returned to the lien holder or his successor or assignee, the original date and hour of receipt by the department or agent of the department shall be void.

When the department is satisfied as to the genuineness and regularity of the documents submitted, it shall issue a new certificate of title or create a paperless electronic record of the title and lien filing when substantiated by a written agreement as provided in section 49–505, Idaho Code. The title shall contain the name of the owner of the vehicle, the name and address of each holder of a lien or encumbrance, and a statement of all liens or encumbrances which have been filed with the department, together with the date of each lien or encumbrance and the date and hour received by the department or agent of the department. The filing of a lien or encumbrance and the notation of it shall be a condition of perfection and shall constitute constructive notice of the lien or encumbrance and its contents to creditors and subsequent purchasers and encumbrancers. All liens or encumbrances so filed with the department shall be perfected and take priority according to the order of time in which the same are noted upon the certificate of title or entered into the electronic records of the department.

(2) The notarization requirement set out in the second paragraph of subsection (1) of this section shall not apply to transactions involving a lien in favor of a regulated lender, as defined in section 28–41–301(37), Idaho Code, or a motor vehicle dealer licensed by the Idaho transportation department. [1988, ch. 265, § 125, p. 549; am. 1991, ch. 143, § 3, p. 336; am. 1992, ch. 143, § 1, p. 436; am. 1993, ch. 283, § 1, p. 957; am. 1993, ch. 298, § 2, p. 1097.]